# SONY CORPORATION OF AMERICA ET AL. *v.* UNIVERSAL CITY STUDIOS, INC., ET AL.

No. 81–1687.   Argued January 18, 1983—Reargued October 3, 1983—
Decided January 17, 1984

418

*Dean C. Dunlavey* reargued the cause for petitioners. With him on the briefs were *Donald E. Sloan* and *Marshall Rutter*.

*Stephen A. Kroft* reargued the cause for respondents. With him on the brief was *Sondra E. Berchin*.*

*Briefs of *amici curiae* urging reversal were filed for the Virginia Citizens' Consumer Council, Inc., et al. by *William A. Dobrovir;* for the American Library Association by *Newton N. Minow;* for the Consumer Electronics Group by *J. Edward Day;* for the Educators Ad Hoc Committee on

JUSTICE STEVENS delivered the opinion of the Court.

Petitioners manufacture and sell home video tape record-ers.  Respondents own the copyrights on some of the tele-

Copyright Law by *Michael H. Cardozo, August W. Steinhilber*, and *Gwendolyn H. Gregory;* for General Electric Co. et al. by *Alfred B. Engelberg, Morton Amster, Jesse Rothstein*, and *Joel E. Lutzker;* for Hitachi, Ltd., et al. by *John W. Armagost* and *Craig B. Jorgensen;* for McCann-Erickson, Inc., et al. by *John A. Donovan, A. Howard Matz*, and *David Fleischer;* for Minnesota Mining and Manufacturing Co. et al. by *Sidney A. Diamond* and *Grier Curran Raclin;* for the National Retail Merchants Association by *Peter R. Stern, Theodore S. Steingut*, and *Robert A. Weiner;* for Sanyo Electric, Inc., by *Anthony Liebig;* for Sears, Roebuck and Co. by *Max L. Gillam* and *Mary E. Woytek;* for TDK Electronics Co., Ltd., by *Ko-Yung Tung* and *Adam Yarmolinsky;* for Toshiba Corp. et al. by *Donald J. Zoeller* and *Herve Gouraige;* for Pfizer Inc. by *Steven C. Kany;* and for Viare Publishing by *Peter F. Marvin.*

Briefs of *amici curiae* urging affirmance were filed for the Association of American Publishers, Inc., et al. by *Charles H. Lieb* and *Jon A. Baumgarten;* for the Authors League of America, Inc., by *Irwin Karp;* for CBS Inc. by *Lloyd N. Cutler, Louis R. Cohen*, and *George Vradenburg III;* for Creators and Distributors of Programs by *Stuart Robinowitz* and *Andrew J. Peck;* for the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, AFL-CIO, by *Leo Geffner;* for the Motion Picture Association of America, Inc., by *Richard M. Cooper, Ellen S. Huvelle*, and *William Nix;* for the National Music Publishers' Association, Inc., by *Jon A. Baumgarten;* for the Recording Industry Association of America, Inc., by *James F. Fitzpatrick, Cary H. Sherman*, and *Ernest S. Meyers;* for Volunteer Lawyers for the Arts, Inc., by *I. Fred Koenigsberg;* and for the Writers Guild of America, West, Inc., et al. by *Paul P. Selvin, Jerome B. Lurie*, and *Paul S. Berger.*

Briefs of *amici curiae* were filed for the State of Missouri et al. by *John Ashcroft*, Attorney General of Missouri, and by the Attorneys General for their respective States as follows: *Charles A. Graddick* of Alabama, *John Steven Clark* of Arkansas, *Michael J. Bowers* of Georgia, *Tany S. Hong* of Hawaii, *Tyrone C. Fahner* of Illinois, *Thomas J. Miller* of Iowa, *William J. Guste, Jr.*, of Louisiana, *William A. Allain* of Mississippi, *Michael T. Greely* of Montana, *Rufus L. Edmisten* of North Carolina, *William J. Brown* of Ohio, *Jan Eric Cartwright* of Oklahoma, *Dennis J. Roberts II* of Rhode Island, *John J. Easton* of Vermont, *Gerald L. Baliles* of Virginia, and *Bronson C. La Follette* of Wisconsin; and for the Committee on Copy-

420

vision programs that are broadcast on the public airwaves. Some members of the general public use video tape recorders sold by petitioners to record some of these broadcasts, as well as a large number of other broadcasts. The question presented is whether the sale of petitioners' copying equipment to the general public violates any of the rights conferred upon respondents by the Copyright Act.

Respondents commenced this copyright infringement action against petitioners in the United States District Court for the Central District of California in 1976. Respondents alleged that some individuals had used Betamax video tape recorders (VTR's) to record some of respondents' copyrighted works which had been exhibited on commercially sponsored television and contended that these individuals had thereby infringed respondents' copyrights. Respondents further maintained that petitioners were liable for the copyright infringement allegedly committed by Betamax consumers because of petitioners' marketing of the Betamax VTR's.[1] Respondents sought no relief against any Betamax consumer. Instead, they sought money damages and an equitable accounting of profits from petitioners, as well as an injunction against the manufacture and marketing of Betamax VTR's.

After a lengthy trial, the District Court denied respondents all the relief they sought and entered judgment for petitioners. 480 F. Supp. 429 (1979). The United States Court of Appeals for the Ninth Circuit reversed the District Court's judgment on respondents' copyright claim, holding petitioners liable for contributory infringement and ordering the District Court to fashion appropriate relief. 659 F. 2d 963

right and Literary Property of the Association of the Bar of the City of New York by *Michael S. Oberman* and *David H. Marks.*

[1] The respondents also asserted causes of action under state law and § 43(a) of the Trademark Act of 1946, 60 Stat. 441, 15 U. S. C. § 1125(a). These claims are not before this Court.

(1981). We granted certiorari, 457 U. S. 1116 (1982); since we had not completed our study of the case last Term, we ordered reargument, 463 U. S. 1226 (1983). We now reverse.

An explanation of our rejection of respondents' unprecedented attempt to impose copyright liability upon the distributors of copying equipment requires a quite detailed recitation of the findings of the District Court. In summary, those findings reveal that the average member of the public uses a VTR principally to record a program he cannot view as it is being televised and then to watch it once at a later time. This practice, known as "time-shifting," enlarges the television viewing audience. For that reason, a significant amount of television programming may be used in this manner without objection from the owners of the copyrights on the programs. For the same reason, even the two respondents in this case, who do assert objections to time-shifting in this litigation, were unable to prove that the practice has impaired the commercial value of their copyrights or has created any likelihood of future harm. Given these findings, there is no basis in the Copyright Act upon which respondents can hold petitioners liable for distributing VTR's to the general public. The Court of Appeals' holding that respondents are entitled to enjoin the distribution of VTR's, to collect royalties on the sale of such equipment, or to obtain other relief, if affirmed, would enlarge the scope of respondents' statutory monopolies to encompass control over an article of commerce that is not the subject of copyright protection. Such an expansion of the copyright privilege is beyond the limits of the grants authorized by Congress.

I

The two respondents in this action, Universal City Studios, Inc., and Walt Disney Productions, produce and hold the copyrights on a substantial number of motion pictures and other audiovisual works. In the current marketplace, they can exploit their rights in these works in a number of ways:

by authorizing theatrical exhibitions, by licensing limited showings on cable and network television, by selling syndication rights for repeated airings on local television stations, and by marketing programs on prerecorded videotapes or videodiscs. Some works are suitable for exploitation through all of these avenues, while the market for other works is more limited.

Petitioner Sony manufactures millions of Betamax video tape recorders and markets these devices through numerous retail establishments, some of which are also petitioners in this action.[2] Sony's Betamax VTR is a mechanism consisting of three basic components: (1) a tuner, which receives electromagnetic signals transmitted over the television band of the public airwaves and separates them into audio and visual signals; (2) a recorder, which records such signals on a magnetic tape; and (3) an adapter, which converts the audio and visual signals on the tape into a composite signal that can be received by a television set.

Several capabilities of the machine are noteworthy. The separate tuner in the Betamax enables it to record a broadcast off one station while the television set is tuned to another channel, permitting the viewer, for example, to watch two simultaneous news broadcasts by watching one "live" and recording the other for later viewing. Tapes may be reused, and programs that have been recorded may be erased either before or after viewing. A timer in the Betamax can be used to activate and deactivate the equipment at predetermined

---

[2] The four retailers are Carter Hawley Hales Stores, Inc., Associated Dry Goods Corp., Federated Department Stores, Inc., and Henry's Camera Corp. The principal defendants are Sony Corporation, the manufacturer of the equipment, and its wholly owned subsidiary, Sony Corporation of America. The advertising agency of Doyle Dane Bernback, Inc., also involved in marketing the Betamax, is also a petitioner. An individual VTR user, William Griffiths, was named as a defendant in the District Court, but respondents sought no relief against him. Griffiths is not a petitioner. For convenience, we shall refer to petitioners collectively as Sony.

times, enabling an intended viewer to record programs that are transmitted when he or she is not at home. Thus a person may watch a program at home in the evening even though it was broadcast while the viewer was at work during the afternoon. The Betamax is also equipped with a pause button and a fast-forward control. The pause button, when depressed, deactivates the recorder until it is released, thus enabling a viewer to omit a commercial advertisement from the recording, provided, of course, that the viewer is present when the program is recorded. The fast-forward control enables the viewer of a previously recorded program to run the tape rapidly when a segment he or she does not desire to see is being played back on the television screen.

The respondents and Sony both conducted surveys of the way the Betamax machine was used by several hundred owners during a sample period in 1978. Although there were some differences in the surveys, they both showed that the primary use of the machine for most owners was "time-shifting"—the practice of recording a program to view it once at a later time, and thereafter erasing it. Time-shifting enables viewers to see programs they otherwise would miss because they are not at home, are occupied with other tasks, or are viewing a program on another station at the time of a broadcast that they desire to watch. Both surveys also showed, however, that a substantial number of interviewees had accumulated libraries of tapes.[3] Sony's survey indicated

---

[3] As evidence of how a VTR may be used, respondents offered the testimony of William Griffiths. Griffiths, although named as an individual defendant, was a client of plaintiffs' law firm. The District Court summarized his testimony as follows:

"He owns approximately 100 tapes. When Griffiths bought his Betamax, he intended not only to time-shift (record, play-back and then erase) but also to build a library of cassettes. Maintaining a library, however, proved too expensive, and he is now erasing some earlier tapes and reusing them.

"Griffiths copied about 20 minutes of a Universal motion picture called 'Never Give An Inch,' and two episodes from Universal television series

that over 80% of the interviewees watched at least as much regular television as they had before owning a Betamax.[4]   Respondents offered no evidence of decreased television viewing by Betamax owners.[5]

Sony introduced considerable evidence describing television programs that could be copied without objection from any copyright holder, with special emphasis on sports, religious, and educational programming.  For example, their survey indicated that 7.3% of all Betamax use is to record sports events, and representatives of professional baseball, football, basketball, and hockey testified that they had no objection to the recording of their televised events for home use.[6]

---

entitled 'Baa Baa Black Sheep' and 'Holmes and Yo Yo.'   He would have erased each of these but for the request of plaintiffs' counsel that it be kept. Griffiths also testified that he had copied but already erased Universal films called 'Alpha Caper' (erased before anyone saw it) and 'Amelia Earhart.'   At the time of his deposition Griffiths did not intend to keep any Universal film in his library.

"Griffiths has also recorded documentaries, news broadcasts, sporting events and political programs such as a rerun of the Nixon/Kennedy debate."   480 F. Supp. 429, 436–437 (1979).

Four other witnesses testified to having engaged in similar activity.

[4] The District Court summarized some of the findings in these surveys as follows:

"According to plaintiffs' survey, 75.4% of the VTR owners use their machines to record for time-shifting purposes half or most of the time. Defendants' survey showed that 96% of the Betamax owners had used the machine to record programs they otherwise would have missed.

"When plaintiffs asked interviewees how many cassettes were in their library, 55.8% said there were 10 or fewer.   In defendants' survey, of the total programs viewed by interviewees in the past month, 70.4% had been viewed only that one time and for 57.9%, there were no plans for further viewing."   Id., at 438.

[5] "81.9% of the defendants' interviewees watched the same amount or more of regular television as they did before owning a Betamax.   83.2% reported their frequency of movie going was unaffected by Betamax." Id., at 439.

[6] See Defendants' Exh. OT, Table 20; Tr. 2447–2450, 2480, 2486–2487, 2515–2516, 2530–2534.

Respondents offered opinion evidence concerning the future impact of the unrestricted sale of VTR's on the commercial value of their copyrights. The District Court found, however, that they had failed to prove any likelihood of future harm from the use of VTR's for time-shifting. 480 F. Supp., at 469.

## The District Court's Decision

The lengthy trial of the case in the District Court concerned the private, home use of VTR's for recording programs broadcast on the public airwaves without charge to the viewer.[7] No issue concerning the transfer of tapes to other persons, the use of home-recorded tapes for public performances, or the copying of programs transmitted on pay or cable television systems was raised. See id., at 432–433, 442.

The District Court concluded that noncommercial home use recording of material broadcast over the public airwaves was a fair use of copyrighted works and did not constitute copyright infringement. It emphasized the fact that the material was broadcast free to the public at large, the noncommercial character of the use, and the private character of the activity conducted entirely within the home. Moreover, the court found that the purpose of this use served the public interest in increasing access to television programming, an interest that "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U. S. 94, 102." Id., at 454.[8] Even when an entire copyrighted work was recorded,

---

[7] The trial also briefly touched upon demonstrations of the Betamax by the retailer petitioners which were alleged to be infringements by respondents. The District Court held against respondents on this claim, 480 F. Supp., at 456–457, the Court of Appeals affirmed this holding, 659 F. 2d 963, 976 (1981), and respondents did not cross-petition on this issue.

[8] The court also found that this "access is not just a matter of convenience, as plaintiffs have suggested. Access has been limited not simply by inconvenience but by the basic need to work. Access to the better pro-

the District Court regarded the copying as fair use "because there is no accompanying reduction in the market for 'plaintiff's original work.'" *Ibid.*

As an independent ground of decision, the District Court also concluded that Sony could not be held liable as a contributory infringer even if the home use of a VTR was considered an infringing use. The District Court noted that Sony had no direct involvement with any Betamax purchasers who recorded copyrighted works off the air. Sony's advertising was silent on the subject of possible copyright infringement, but its instruction booklet contained the following statement:

> "Television programs, films, videotapes and other materials may be copyrighted. Unauthorized recording of such material may be contrary to the provisions of the United States copyright laws." *Id.*, at 436.

The District Court assumed that Sony had constructive knowledge of the probability that the Betamax machine would be used to record copyrighted programs, but found that Sony merely sold a "product capable of a variety of uses, some of them allegedly infringing." *Id.*, at 461. It reasoned:

> "Selling a staple article of commerce—*e. g.*, a typewriter, a recorder, a camera, a photocopying machine— technically contributes to any infringing use subsequently made thereof, but this kind of 'contribution,' if deemed sufficient as a basis for liability, would expand the theory beyond precedent and arguably beyond judicial management.

> .   .   .   .   .

> ". . . Commerce would indeed be hampered if manufacturers of staple items were held liable as contributory infringers whenever they 'constructively' knew that some purchasers on some occasions would use their product

gram has also been limited by the competitive practice of counterprogramming." 480 F. Supp., at 454.

for a purpose which a court later deemed, as a matter of first impression, to be an infringement." *Ibid.*

Finally, the District Court discussed the respondents' prayer for injunctive relief, noting that they had asked for an injunction either preventing the future sale of Betamax machines, or requiring that the machines be rendered incapable of recording copyrighted works off the air. The court stated that it had "found no case in which the manufacturers, distributors, retailers and advertisers of the instrument enabling the infringement were sued by the copyright holders," and that the request for relief in this case "is unique." *Id.,* at 465.

It concluded that an injunction was wholly inappropriate because any possible harm to respondents was outweighed by the fact that "the Betamax could still legally be used to record noncopyrighted material or material whose owners consented to the copying. An injunction would deprive the public of the ability to use the Betamax for this noninfringing off-the-air recording." *Id.,* at 468.

## The Court of Appeals' Decision

The Court of Appeals reversed the District Court's judgment on respondents' copyright claim. It did not set aside any of the District Court's findings of fact. Rather, it concluded as a matter of law that the home use of a VTR was not a fair use because it was not a "productive use." [9] It therefore held that it was unnecessary for plaintiffs to prove any harm to the potential market for the copyrighted works, but then observed that it seemed clear that the cumulative effect of mass reproduction made possible by VTR's would tend to diminish the potential market for respondents' works. 659 F. 2d, at 974.

---

[9] "Without a 'productive use,' *i. e.* when copyrighted material is reproduced for its intrinsic use, the mass copying of the sort involved in this case precludes an application of fair use." 659 F. 2d, at 971–972.

On the issue of contributory infringement, the Court of Appeals first rejected the analogy to staple articles of commerce such as tape recorders or photocopying machines. It noted that such machines "may have substantial benefit for some purposes" and do not "even remotely raise copyright problems." *Id.*, at 975. VTR's, however, are sold "for the primary purpose of reproducing television programming" and "[v]irtually all" such programming is copyrighted material. *Ibid.* The Court of Appeals concluded, therefore, that VTR's were not suitable for any substantial noninfringing use even if some copyright owners elect not to enforce their rights.

The Court of Appeals also rejected the District Court's reliance on Sony's lack of knowledge that home use constituted infringement. Assuming that the statutory provisions defining the remedies for infringement applied also to the non-statutory tort of contributory infringement, the court stated that a defendant's good faith would merely reduce his damages liability but would not excuse the infringing conduct. It held that Sony was chargeable with knowledge of the homeowner's infringing activity because the reproduction of copyrighted materials was either "the most conspicuous use" or "the major use" of the Betamax product. *Ibid.*

On the matter of relief, the Court of Appeals concluded that "statutory damages may be appropriate" and that the District Court should reconsider its determination that an injunction would not be an appropriate remedy; and, referring to "the analogous photocopying area," suggested that a continuing royalty pursuant to a judicially created compulsory license may very well be an acceptable resolution of the relief issue. *Id.*, at 976.

## II

Article I, § 8, of the Constitution provides:

"The Congress shall have Power . . . To Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

> "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration. In *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 127, Chief Justice Hughes spoke as follows respecting the copyright monopoly granted by Congress, 'The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.' It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius." *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 158 (1948).

As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product. Because this task involves a difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand, our patent and copyright statutes have been amended repeatedly.[10]

[10] In its Report accompanying the comprehensive revision of the Copyright Act in 1909, the Judiciary Committee of the House of Representatives explained this balance:

"The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings, . . . but upon the ground that the welfare of the public will be

From its beginning, the law of copyright has developed in response to significant changes in technology.[11]    Indeed, it was the invention of a new form of copying equipment—the printing press—that gave rise to the original need for copyright protection.[12]    Repeatedly, as new developments have

served and progress of science and useful arts will be promoted by securing to authors for limited periods the exclusive rights to their writings. . . .

"In enacting a copyright law Congress must consider . . . two questions: First, how much will the legislation stimulate the producer and so benefit the public; and, second, how much will the monopoly granted be detrimental to the public?    The granting of such exclusive rights, under the proper terms and conditions, confers a benefit upon the public that outweighs the evils of the temporary monopoly."    H. R. Rep. No. 2222, 60th Cong., 2d Sess., 7 (1909).

[11] Thus, for example, the development and marketing of player pianos and perforated rolls of music, see *White-Smith Music Publishing Co.* v. *Apollo Co.*, 209 U. S. 1 (1908), preceded the enactment of the Copyright Act of 1909; innovations in copying techniques gave rise to the statutory exemption for library copying embodied in § 108 of the 1976 revision of the copyright law; the development of the technology that made it possible to retransmit television programs by cable or by microwave systems, see *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390 (1968), and *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 415 U. S. 394 (1974), prompted the enactment of the complex provisions set forth in 17 U. S. C. § 111(d)(2)(B) and § 111(d)(5) (1982 ed.) after years of detailed congressional study, see *Eastern Microwave, Inc.* v. *Doubleday Sports, Inc.*, 691 F. 2d 125, 129 (CA2 1982).

By enacting the Sound Recording Amendment of 1971, 85 Stat. 391, Congress also provided the solution to the "record piracy" problems that had been created by the development of the audio tape recorder.    Sony argues that the legislative history of that Act, see especially H. R. Rep. No. 92–487, p. 7 (1971), indicates that Congress did not intend to prohibit the private home use of either audio or video tape recording equipment. In view of our disposition of the contributory infringement issue, we express no opinion on that question.

[12] "Copyright protection became necessary with the invention of the printing press and had its early beginnings in the British censorship laws. The fortunes of the law of copyright have always been closely connected with freedom of expression, on the one hand, and with technological improvements in means of dissemination, on the other.    Successive ages have drawn different balances among the interest of the writer in the control and exploitation of his intellectual property, the related interest of the

occurred in this country, it has been the Congress that has fashioned the new rules that new technology made necessary. Thus, long before the enactment of the Copyright Act of 1909, 35 Stat. 1075, it was settled that the protection given to copyrights is wholly statutory. *Wheaton* v. *Peters*, 8 Pet. 591, 661–662 (1834). The remedies for infringement "are only those prescribed by Congress." *Thompson* v. *Hubbard*, 131 U. S. 123, 151 (1889).

The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme. See, *e. g.*, *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 415 U. S. 394 (1974); *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390 (1968); *White-Smith Music Publishing Co.* v. *Apollo Co.*, 209 U. S. 1 (1908); *Williams & Wilkins Co.* v. *United States*, 203 Ct. Cl. 74, 487 F. 2d 1345 (1973), aff'd by an equally divided Court, 420 U. S. 376 (1975). Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.

In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests. In doing so, we are guided by Justice Stewart's exposition of the correct approach to ambiguities in the law of copyright:

> "The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be

---

publisher, and the competing interest of society in the untrammeled dissemination of ideas." Foreword to B. Kaplan, An Unhurried View of Copyright vii–viii (1967).

encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good. 'The sole interest of the United States and the primary object in conferring the monopoly,' this Court has said, 'lie in the general benefits derived by the public from the labors of authors.' *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 127. See *Kendall* v. *Winsor,* 21 How. 322, 327–328; *Grant* v. *Raymond,* 6 Pet. 218, 241–242. When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Twentieth Century Music Corp.* v. *Aiken,* 422 U. S. 151, 156 (1975) (footnotes omitted).

Copyright protection "subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U. S. C. § 102(a) (1982 ed.). This protection has never accorded the copyright owner complete control over all possible uses of his work.[13] Rather, the Copyright Act grants the

---

[13] See, *e. g., White-Smith Music Publishing Co.* v. *Apollo Co.,* 209 U. S., at 19; cf. *Deep South Packing Co.* v. *Laitram Corp.,* 406 U. S. 518, 530–531 (1972). While the law has never recognized an author's right to absolute control of his work, the natural tendency of legal rights to express themselves in absolute terms to the exclusion of all else is particularly pronounced in the history of the constitutionally sanctioned monopolies of the copyright and the patent. See, *e. g., United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 156–158 (1948) (copyright owners claiming right to tie license of one film to license of another under copyright law); *Fox Film Corp.* v. *Doyal,* 286 U. S. 123 (1932) (copyright owner claiming copyright renders it immune from state taxation of copyright royalties); *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339, 349–351 (1908) (copyright owner claiming that a right to fix resale price of his works within the scope of his copyright); *International Business Machines Corp.* v. *United States,* 298

copyright holder "exclusive" rights to use and to authorize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies. § 106.[14] All reproductions of the work, however, are not within the exclusive domain of the copyright owner; some are in the public domain. Any individual may reproduce a copyrighted work for a "fair use"; the copyright owner does not possess the exclusive right to such a use. Compare § 106 with § 107.

"Anyone who violates any of the exclusive rights of the copyright owner," that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute, "is an infringer of the copyright." § 501(a). Conversely, anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute or who makes a fair use of the work is not an infringer of the copyright with respect to such use.

The Copyright Act provides the owner of a copyright with a potent arsenal of remedies against an infringer of his work, including an injunction to restrain the infringer from violat-

---

U. S. 131 (1936) (patentees claiming right to tie sale of unpatented article to lease of patented device).

[14] Section 106 of the Act provides:

"Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

"(1) to reproduce the copyrighted work in copies or phonorecords;

"(2) to prepare derivative works based upon the copyrighted work;

"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

"(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

"(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly."

ing his rights, the impoundment and destruction of all reproductions of his work made in violation of his rights, a recovery of his actual damages and any additional profits realized by the infringer or a recovery of statutory damages, and attorney's fees. §§ 502–505.[15]

The two respondents in this case do not seek relief against the Betamax users who have allegedly infringed their copyrights. Moreover, this is not a class action on behalf of all copyright owners who license their works for television broadcast, and respondents have no right to invoke whatever rights other copyright holders may have to bring infringement actions based on Betamax copying of their works.[16] As was made clear by their own evidence, the copying of the respondents' programs represents a small portion of the total use of VTR's. It is, however, the taping of respondents' own copyrighted programs that provides them with standing to charge Sony with contributory infringement. To prevail, they have the burden of proving that users of the Betamax have infringed their copyrights and that Sony should be held responsible for that infringement.

## III

The Copyright Act does not expressly render anyone liable for infringement committed by another. In contrast, the

---

[15] Moreover, anyone who willfully infringes the copyright to reproduce a motion picture for purposes of commercial advantage or private financial gain is subject to substantial criminal penalties, 17 U. S. C. § 506(a) (1982 ed.), and the fruits and instrumentalities of the crime are forfeited upon conviction, § 506(b).

[16] In this regard, we reject respondents' attempt to cast this action as comparable to a class action because of the positions taken by *amici* with copyright interests and their attempt to treat the statements made by *amici* as evidence in this case. See Brief for Respondents 1, and n. 1, 6, 52, 53, and n. 116. The stated desires of *amici* concerning the outcome of this or any litigation are no substitute for a class action, are not evidence in the case, and do not influence our decision; we examine an *amicus curiae* brief solely for whatever aid it provides in analyzing the legal questions before us.

Patent Act expressly brands anyone who "actively induces infringement of a patent" as an infringer, 35 U. S. C. § 271(b), and further imposes liability on certain individuals labeled "contributory" infringers, § 271(c). The absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity.[17]  For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another.

Such circumstances were plainly present in *Kalem Co.* v. *Harper Brothers*, 222 U. S. 55 (1911), the copyright decision of this Court on which respondents place their principal reliance.  In *Kalem*, the Court held that the producer of an unauthorized film dramatization of the copyrighted book Ben Hur was liable for his sale of the motion picture to jobbers, who in turn arranged for the commercial exhibition of the film.  Justice Holmes, writing for the Court, explained:

> "The defendant not only expected but invoked by advertisement the use of its films for dramatic reproduc-

---

[17] As the District Court correctly observed, however, "the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn . . . ." 480 F. Supp., at 457–458.  The lack of clarity in this area may, in part, be attributable to the fact that an infringer is not merely one who uses a work without authorization by the copyright owner, but also one who authorizes the use of a copyrighted work without actual authority from the copyright owner.

We note the parties' statements that the questions of Sony's liability under the "doctrines" of "direct infringement" and "vicarious liability" are not nominally before this Court.  Compare Brief for Respondents 9, n. 22, 41, n. 90, with Reply Brief for Petitioners 1, n. 2.  We also observe, however, that reasoned analysis of respondents' unprecedented contributory infringement claim necessarily entails consideration of arguments and case law which may also be forwarded under the other labels, and indeed the parties to a large extent rely upon such arguments and authority in support of their respective positions on the issue of contributory infringement.

tion of the story. That was the most conspicuous purpose for which they could be used, and the one for which especially they were made. If the defendant did not contribute to the infringement it is impossible to do so except by taking part in the final act. It is liable on principles recognized in every part of the law." *Id.*, at 62–63.

The use for which the item sold in *Kalem* had been "especially" made was, of course, to display the performance that had already been recorded upon it. The producer had personally appropriated the copyright owner's protected work and, as the owner of the tangible medium of expression upon which the protected work was recorded, authorized that use by his sale of the film to jobbers. But that use of the film was not his to authorize: the copyright owner possessed the exclusive right to authorize public performances of his work. Further, the producer personally advertised the unauthorized public performances, dispelling any possible doubt as to the use of the film which he had authorized.

Respondents argue that *Kalem* stands for the proposition that supplying the "means" to accomplish an infringing activity and encouraging that activity through advertisement are sufficient to establish liability for copyright infringement. This argument rests on a gross generalization that cannot withstand scrutiny. The producer in *Kalem* did not merely provide the "means" to accomplish an infringing activity; the producer supplied the work itself, albeit in a new medium of expression. Sony in the instant case does not supply Betamax consumers with respondents' works; respondents do. Sony supplies a piece of equipment that is generally capable of copying the entire range of programs that may be televised: those that are uncopyrighted, those that are copyrighted but may be copied without objection from the copyright holder, and those that the copyright holder would prefer not to have copied. The Betamax can be used to

make authorized or unauthorized uses of copyrighted works, but the range of its potential use is much broader than the particular infringing use of the film Ben Hur involved in *Kalem*. *Kalem* does not support respondents' novel theory of liability.

Justice Holmes stated that the producer had "contributed" to the infringement of the copyright, and the label "contributory infringement" has been applied in a number of lower court copyright cases involving an ongoing relationship between the direct infringer and the contributory infringer at the time the infringing conduct occurred. In such cases, as in other situations in which the imposition of vicarious liability is manifestly just, the "contributory" infringer was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner.[18] This case, however, plainly does not fall

---

[18] The so-called "dance hall cases," *Famous Music Corp.* v. *Bay State Harness Horse Racing & Breeding Assn., Inc.*, 554 F. 2d 1213 (CA1 1977) (racetrack retained infringer to supply music to paying customers); *KECA Music, Inc.* v. *Dingus McGee's Co.*, 432 F. Supp. 72 (WD Mo. 1977) (cocktail lounge hired musicians to supply music to paying customers); *Dreamland Ball Room, Inc.* v. *Shapiro, Bernstein & Co.*, 36 F. 2d 354 (CA7 1929) (dance hall hired orchestra to supply music to paying customers), are often contrasted with the so-called landlord-tenant cases, in which landlords who leased premises to a direct infringer for a fixed rental and did not participate directly in any infringing activity were found not to be liable for contributory infringement. *E. g., Deutsch* v. *Arnold*, 98 F. 2d 686 (CA2 1938).

In *Shapiro, Bernstein & Co.* v. *H. L. Green Co.*, 316 F. 2d 304 (CA2 1963), the owner of 23 chainstores retained the direct infringer to run its record departments. The relationship was structured as a licensing arrangement, so that the defendant bore none of the business risk of running the department. Instead, it received 10% or 12% of the direct infringer's gross receipts. The Court of Appeals concluded:

"[The dance-hall cases] and this one lie closer on the spectrum to the employer-employee model, than to the landlord-tenant model. . . . [O]n the particular facts before us, . . . Green's relationship to its infringing licensee, as well as its strong concern for the financial success of the phono-

in that category. The only contact between Sony and the users of the Betamax that is disclosed by this record occurred at the moment of sale. The District Court expressly found that "no employee of Sony, Sonam or DDBI had either direct involvement with the allegedly infringing activity or direct contact with purchasers of Betamax who recorded copyrighted works off-the-air." 480 F. Supp., at 460. And it further found that "there was no evidence that any of the copies made by Griffiths or the other individual witnesses in this suit were influenced or encouraged by [Sony's] advertisements." *Ibid.*

---

graph record concession, renders it liable for the unauthorized sales of the 'bootleg' records.

. . . . .

". . . [T]he imposition of *vicarious* liability in the case before us cannot be deemed unduly harsh or unfair. Green has the power to police carefully the conduct of its concessionaire . . .; our judgment will simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised." *Id.*, at 308 (emphasis in original).

In *Gershwin Publishing Corp.* v. *Columbia Artists Management, Inc.*, 443 F. 2d 1159 (CA2 1971), the direct infringers retained the contributory infringer to manage their performances. The contributory infringer would contact each direct infringer, obtain the titles of the musical compositions to be performed, print the programs, and then sell the programs to its own local organizations for distribution at the time of the direct infringement. *Id.*, at 1161. The Court of Appeals emphasized that the contributory infringer had actual knowledge that the artists it was managing were performing copyrighted works, was in a position to police the infringing conduct of the artists, and derived substantial benefit from the actions of the primary infringers. *Id.*, at 1163.

In *Screen Gems-Columbia Music, Inc.* v. *Mark-Fi Records, Inc.*, 256 F. Supp. 399 (SDNY 1966), the direct infringer manufactured and sold bootleg records. In denying a motion for summary judgment, the District Court held that the infringer's advertising agency, the radio stations that advertised the infringer's works, and the service agency that boxed and mailed the infringing goods could all be held liable, if at trial it could be demonstrated that they knew or should have known that they were dealing in illegal goods.

If vicarious liability is to be imposed on Sony in this case, it must rest on the fact that it has sold equipment with constructive knowledge of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material. There is no precedent in the law of copyright for the imposition of vicarious liability on such a theory. The closest analogy is provided by the patent law cases to which it is appropriate to refer because of the historic kinship between patent law and copyright law.[19]

---

[19] *E. g., United States* v. *Paramount Pictures, Inc.*, 334 U. S., at 158; *Fox Film Corp.* v. *Doyal*, 286 U. S., at 131; *Wheaton* v. *Peters*, 8 Pet. 591, 657–658 (1834). The two areas of the law, naturally, are not identical twins, and we exercise the caution which we have expressed in the past in applying doctrine formulated in one area to the other. See generally *Mazer* v. *Stein*, 347 U. S. 201, 217–218 (1954); *Bobbs-Merrill Co.* v. *Straus*, 210 U. S., at 345.

We have consistently rejected the proposition that a similar kinship exists between copyright law and trademark law, and in the process of doing so have recognized the basic similarities between copyrights and patents. *The Trade-Mark Cases*, 100 U. S. 82, 91–92 (1879); see also *United Drug Co.* v. *Theodore Rectanus Co.*, 248 U. S. 90, 97 (1918) (trademark right "has little or no analogy" to copyright or patent); *McLean* v. *Fleming*, 96 U. S. 245, 254 (1878); *Canal Co.* v. *Clark*, 13 Wall. 311, 322 (1872). Given the fundamental differences between copyright law and trademark law, in this copyright case we do not look to the standard for contributory infringement set forth in *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 854–855 (1982), which was crafted for application in trademark cases. There we observed that a manufacturer or distributor could be held liable to the owner of a trademark if it intentionally induced a merchant down the chain of distribution to pass off its product as that of the trademark owner's or if it continued to supply a product which could readily be passed off to a particular merchant whom it knew was mislabeling the product with the trademark owner's mark. If *Inwood*'s narrow standard for contributory trademark infringement governed here, respondents' claim of contributory infringement would merit little discussion. Sony certainly does not "intentionally induc[e]" its customers to make infringing uses of respondents' copyrights, nor does it supply its products to identified individuals known by it to be engaging in continuing infringement of respondents' copyrights, see *id.*, at 855.

In the Patent Act both the concept of infringement and the concept of contributory infringement are expressly defined by statute.[20] The prohibition against contributory infringement is confined to the knowing sale of a component especially made for use in connection with a particular patent. There is no suggestion in the statute that one patentee may object to the sale of a product that might be used in connection with other patents. Moreover, the Act expressly provides that the sale of a "staple article or commodity of commerce suitable for substantial noninfringing use" is not contributory infringement. 35 U. S. C. § 271(c).

When a charge of contributory infringement is predicated entirely on the sale of an article of commerce that is used by the purchaser to infringe a patent, the public interest in access to that article of commerce is necessarily implicated. A

---

[20] Title 35 U. S. C. § 271 provides:

"(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

"(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

finding of contributory infringement does not, of course, remove the article from the market altogether; it does, however, give the patentee effective control over the sale of that item. Indeed, a finding of contributory infringement is normally the functional equivalent of holding that the disputed article is within the monopoly granted to the patentee.[21]

For that reason, in contributory infringement cases arising under the patent laws the Court has always recognized the critical importance of not allowing the patentee to extend his monopoly beyond the limits of his specific grant. These cases deny the patentee any right to control the distribution of unpatented articles unless they are "unsuited for any commercial noninfringing use." *Dawson Chemical Co.* v. *Rohm & Hass Co.*, 448 U. S. 176, 198 (1980). Unless a commodity "has no use except through practice of the patented method," *id.*, at 199, the patentee has no right to claim that its distribution constitutes contributory infringement. "To form the basis for contributory infringement the item must almost be uniquely suited as a component of the patented invention." P. Rosenberg, Patent Law Fundamentals § 17.02[2] (2d ed. 1982). "[A] sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer. Such a rule would block the wheels of commerce." *Henry* v. *A. B. Dick Co.*, 224 U. S. 1, 48 (1912), overruled on other grounds,

---

[21] It seems extraordinary to suggest that the Copyright Act confers upon all copyright owners collectively, much less the two respondents in this case, the exclusive right to distribute VTR's simply because they may be used to infringe copyrights. That, however, is the logical implication of their claim. The request for an injunction below indicates that respondents seek, in effect, to declare VTR's contraband. Their suggestion in this Court that a continuing royalty pursuant to a judicially created compulsory license would be an acceptable remedy merely indicates that respondents, for their part, would be willing to license their claimed monopoly interest in VTR's to Sony in return for a royalty.

*Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 517 (1917).

We recognize there are substantial differences between the patent and copyright laws. But in both areas the contributory infringement doctrine is grounded on the recognition that adequate protection of a monopoly may require the courts to look beyond actual duplication of a device or publication to the products or activities that make such duplication possible. The staple article of commerce doctrine must strike a balance between a copyright holder's legitimate demand for effective—not merely symbolic—protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce. Accordingly, the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses.

## IV

The question is thus whether the Betamax is capable of commercially significant noninfringing uses. In order to resolve that question, we need not explore *all* the different potential uses of the machine and determine whether or not they would constitute infringement. Rather, we need only consider whether on the basis of the facts as found by the District Court a significant number of them would be noninfringing. Moreover, in order to resolve this case we need not give precise content to the question of how much use is commercially significant. For one potential use of the Betamax plainly satisfies this standard, however it is understood: private, noncommercial time-shifting in the home. It does so both (A) because respondents have no right to prevent other copyright holders from authorizing it for their programs, and (B) because the District Court's factual findings reveal that even the unauthorized home time-shifting of respondents' programs is legitimate fair use.

## A. *Authorized Time-Shifting*

Each of the respondents owns a large inventory of valuable copyrights, but in the total spectrum of television programming their combined market share is small. The exact percentage is not specified, but it is well below 10%.[22] If they were to prevail, the outcome of this litigation would have a significant impact on both the producers and the viewers of the remaining 90% of the programming in the Nation. No doubt, many other producers share respondents' concern about the possible consequences of unrestricted copying. Nevertheless the findings of the District Court make it clear that time-shifting may enlarge the total viewing audience and that many producers are willing to allow private time-shifting to continue, at least for an experimental time period.[23]

The District Court found:

> "Even if it were deemed that home-use recording of copyrighted material constituted infringement, the Betamax could still legally be used to record noncopyrighted material or material whose owners consented to the copying. An injunction would deprive the public of the ability to use the Betamax for this noninfringing off-the-air recording.

---

[22] The record suggests that Disney's programs at the time of trial consisted of approximately one hour a week of network television and one syndicated series. Universal's percentage in the Los Angeles market on commercial television stations was under 5%. See Tr. 532–533, 549–550.

[23] The District Court did not make any explicit findings with regard to how much broadcasting is wholly uncopyrighted. The record does include testimony that at least one movie—My Man Godfrey—falls within that category, *id.*, at 2300–2301, and certain broadcasts produced by the Federal Government are also uncopyrighted. See 17 U. S. C. § 105 (1982 ed.). *Cf. Schnapper v. Foley,* 215 U. S. App. D. C. 59, 667 F. 2d 102 (1981) (explaining distinction between work produced by the Government and work commissioned by the Government). To the extent such broadcasting is now significant, it further bolsters our conclusion. Moreover, since copyright protection is not perpetual, the number of audiovisual works in the public domain necessarily increases each year.

"Defendants introduced considerable testimony at trial about the potential for such copying of sports, religious, educational and other programming. This included testimony from representatives of the Offices of the Commissioners of the National Football, Basketball, Baseball and Hockey Leagues and Associations, the Executive Director of National Religious Broadcasters and various educational communications agencies. Plaintiffs attack the weight of the testimony offered and also contend that an injunction is warranted because infringing uses outweigh noninfringing uses.

"Whatever the future percentage of legal versus illegal home-use recording might be, an injunction which seeks to deprive the public of the very tool or article of commerce capable of some noninfringing use would be an extremely harsh remedy, as well as one unprecedented in copyright law." 480 F. Supp., at 468.

Although the District Court made these statements in the context of considering the propriety of injunctive relief, the statements constitute a finding that the evidence concerning "sports, religious, educational and other programming" was sufficient to establish a significant quantity of broadcasting whose copying is now authorized, and a significant potential for future authorized copying. That finding is amply supported by the record. In addition to the religious and sports officials identified explicitly by the District Court,[24] two items in the record deserve specific mention.

---

[24] See Tr. 2447–2450 (Alexander Hadden, Major League Baseball); *id.*, at 2480, 2486–2487 (Jay Moyer, National Football League); *id.*, at 2515–2516 (David Stern, National Basketball Association); *id.*, at 2530–2534 (Gilbert Stein, National Hockey League); *id.*, at 2543–2552 (Thomas Hansen, National Collegiate Athletic Association); *id.*, at 2565–2572 (Benjamin Armstrong, National Religious Broadcasters). Those officials were authorized to be the official spokespersons for their respective institutions in this litigation. *Id.*, at 2432, 2479, 2509–2510, 2530, 2538, 2563. See Fed. Rule Civ. Proc. 30(b)(6).

First is the testimony of John Kenaston, the station manager of Channel 58, an educational station in Los Angeles affiliated with the Public Broadcasting Service. He explained and authenticated the station's published guide to its programs.[25]  For each program, the guide tells whether unlimited home taping is authorized, home taping is authorized subject to certain restrictions (such as erasure within seven days), or home taping is not authorized at all.  The Spring 1978 edition of the guide described 107 programs.  Sixty-two of those programs or 58% authorize some home taping. Twenty-one of them or almost 20% authorize unrestricted home taping.[26]

Second is the testimony of Fred Rogers, president of the corporation that produces and owns the copyright on Mister Rogers' Neighborhood.  The program is carried by more public television stations than any other program.  Its audience numbers over 3,000,000 families a day.  He testified that he had absolutely no objection to home taping for noncommercial use and expressed the opinion that it is a real service to families to be able to record children's programs and to show them at appropriate times.[27]

---

[25] Tr. 2863–2902; Defendants' Exh. PI.

[26] See also Tr. 2833–2844 (similar testimony by executive director of New Jersey Public Broadcasting Authority).  Cf. id., at 2592–2605 (testimony by chief of New York Education Department's Bureau of Mass Communications approving home taping for educational purposes).

[27] "Some public stations, as well as commercial stations, program the 'Neighborhood' at hours when some children cannot use it.  I think that it's a real service to families to be able to record such programs and show them at appropriate times.  I have always felt that with the advent of all of this new technology that allows people to tape the 'Neighborhood' off-the-air, and I'm speaking for the 'Neighborhood' because that's what I produce, that they then become much more active in the programming of their family's television life.  Very frankly, I am opposed to people being programmed by others.  My whole approach in broadcasting has always been 'You are an important person just the way you are.  You can make healthy decisions.'  Maybe I'm going on too long, but I just feel that anything that allows a person to be more active in the control of his or her life,

446

If there are millions of owners of VTR's who make copies of televised sports events, religious broadcasts, and educational programs such as Mister Rogers' Neighborhood, and if the proprietors of those programs welcome the practice, the business of supplying the equipment that makes such copying feasible should not be stifled simply because the equipment is used by some individuals to make unauthorized reproductions of respondents' works. The respondents do not represent a class composed of all copyright holders. Yet a finding of contributory infringement would inevitably frustrate the interests of broadcasters in reaching the portion of their audience that is available only through time-shifting.

Of course, the fact that other copyright holders may welcome the practice of time-shifting does not mean that respondents should be deemed to have granted a license to copy their programs. Third-party conduct would be wholly irrelevant in an action for direct infringement of respondents' copyrights. But in an action for *contributory* infringement against the seller of copying equipment, the copyright holder may not prevail unless the relief that he seeks affects only his programs, or unless he speaks for virtually all copyright holders with an interest in the outcome. In this case, the record makes it perfectly clear that there are many important producers of national and local television programs who find nothing objectionable about the enlargement in the size of the television audience that results from the practice of time-shifting for private home use.[28] The seller of the equipment that expands those producers' audiences cannot be a con-

---

in a healthy way, is important." *Id.*, at 2920–2921. See also Defendants' Exh. PI, p. 85.

[28] It may be rare for large numbers of copyright owners to authorize duplication of their works without demanding a fee from the copier. In the context of public broadcasting, however, the user of the copyrighted work is not required to pay a fee for access to the underlying work. The traditional method by which copyright owners capitalize upon the television medium—commercially sponsored free public broadcast over the public airwaves—is predicated upon the assumption that compensation for

tributory infringer if, as is true in this case, it has had no direct involvement with any infringing activity.

## B. *Unauthorized Time-Shifting*

Even unauthorized uses of a copyrighted work are not necessarily infringing. An unlicensed use of the copyright is not an infringement unless it conflicts with one of the specific exclusive rights conferred by the copyright statute. *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S., at 154–155. Moreover, the definition of exclusive rights in § 106 of the present Act is prefaced by the words "subject to sections 107 through 118." Those sections describe a variety of uses of copyrighted material that "are not infringements of copyright" "notwithstanding the provisions of section 106." The most pertinent in this case is § 107, the legislative endorsement of the doctrine of "fair use." [29]

---

the value of displaying the works will be received in the form of advertising revenues.

In the context of television programming, some producers evidently believe that permitting home viewers to make copies of their works off the air actually enhances the value of their copyrights. Irrespective of their reasons for authorizing the practice, they do so, and in significant enough numbers to create a substantial market for a noninfringing use of the Sony VTR's. No one could dispute the legitimacy of that market if the producers had authorized home taping of their programs in exchange for a license fee paid directly by the home user. The legitimacy of that market is not compromised simply because these producers have authorized home taping of their programs without demanding a fee from the home user. The copyright law does not require a copyright owner to charge a fee for the use of his works, and as this record clearly demonstrates, the owner of a copyright may well have economic or noneconomic reasons for permitting certain kinds of copying to occur without receiving direct compensation from the copier. It is not the role of the courts to tell copyright holders the best way for them to exploit their copyrights: even if respondents' competitors were ill-advised in authorizing home videotaping, that would not change the fact that they have created a substantial market for a paradigmatic noninfringing use of Sony's product.

[29] The Copyright Act of 1909, 35 Stat. 1075, did not have a "fair use" provision. Although that Act's compendium of exclusive rights "to print,

That section identifies various factors[30] that enable a court to apply an "equitable rule of reason" analysis to particular claims of infringement.[31]  Although not conclusive, the first

---

reprint, publish, copy, and vend the copyrighted work" was broad enough to encompass virtually all potential interactions with a copyrighted work, the statute was never so construed.  The courts simply refused to read the statute literally in every situation.  When Congress amended the statute in 1976, it indicated that it "intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way."  H. R. Rep. No. 94–1476, p. 66 (1976).

[30] Section 107 provides:

"Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U. S. C. § 107 (1982 ed.).

[31] The House Report expressly stated that the fair use doctrine is an "equitable rule of reason" in its explanation of the fair use section:

"Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged.  Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. . . .

·         ·                    ·            ·

"*General intention behind the provision*

"The statement of the fair use doctrine in section 107 offers some guidance to users in determining when the principles of the doctrine apply.  However, the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute.  The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the

factor requires that "the commercial or nonprofit character of an activity" be weighed in any fair use decision.[32]  If the Betamax were used to make copies for a commercial or profit-making purpose, such use would presumptively be unfair. The contrary presumption is appropriate here, however, because the District Court's findings plainly establish that time-shifting for private home use must be characterized as a noncommercial, nonprofit activity.  Moreover, when one considers the nature of a televised copyrighted audiovisual work, see 17 U. S. C. § 107(2) (1982 ed.), and that time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact

---

doctrine in the statute, especially during a period of rapid technological change.  Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis."  H. R. Rep. No. 94–1476, supra, at 65–66.

The Senate Committee similarly eschewed a rigid, bright-line approach to fair use.  The Senate Report endorsed the view "that off-the-air recording for convenience" could be considered "fair use" under some circumstances, although it then made it clear that it did not intend to suggest that off-the-air recording for convenience should be deemed fair use under any circumstances imaginable.  S. Rep. No. 94–473, pp. 65–66 (1975). The latter qualifying statement is quoted by the dissent, post, at 481, and if read in isolation, would indicate that the Committee intended to condemn all off-the-air recording for convenience.  Read in context, however, it is quite clear that that was the farthest thing from the Committee's intention.

[32] "The Committee has amended the first of the criteria to be considered—'the purpose and character of the use'—to state explicitly that this factor includes a consideration of 'whether such use is of a commercial nature or is for non-profit educational purposes.'  This amendment is not intended to be interpreted as any sort of not-for-profit limitation on educational uses of copyrighted works.  It is an express recognition that, as under the present law, the commercial or non-profit character of an activity, while not conclusive with respect to fair use, can and should be weighed along with other factors in fair use decisions."  H. R. Rep. No. 94–1476, supra, at 66.

that the entire work is reproduced, see § 107(3), does not have its ordinary effect of militating against a finding of fair use.[33]

This is not, however, the end of the inquiry because Congress has also directed us to consider "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). The purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create. The prohibition of such noncommercial uses would

---

[33] It has been suggested that "consumptive uses of copyrights by home VTR users are commercial even if the consumer does not sell the home-made tape because the consumer will not buy tapes separately sold by the copyrightholder." Home Recording of Copyrighted Works: Hearing before the Subcommittee on Courts, Civil Liberties and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 2d Sess., pt. 2, p. 1250 (1982) (memorandum of Prof. Laurence H. Tribe). Furthermore, "[t]he error in excusing such theft as noncommercial," we are told, "can be seen by simple analogy: jewel theft is not converted into a noncommercial veniality if stolen jewels are simply worn rather than sold." *Ibid.* The premise and the analogy are indeed simple, but they add nothing to the argument. The use to which stolen jewelry is put is quite irrelevant in determining whether depriving its true owner of his present possessory interest in it is venial; because of the nature of the item and the true owner's interests in physical possession of it, the law finds the taking objectionable even if the thief does not use the item at all. Theft of a particular item of personal property of course may have commercial significance, for the thief deprives the owner of his right to sell that particular item to any individual. Time-shifting does not even remotely entail comparable consequences to the copyright owner. Moreover, the time-shifter no more steals the program by watching it once than does the live viewer, and the live viewer is no more likely to buy prerecorded videotapes than is the time-shifter. Indeed, no live viewer would buy a prerecorded videotape if he did not have access to a VTR.

merely inhibit access to ideas without any countervailing benefit.[34]

Thus, although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter. A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work. Actual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage. Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.

In this case, respondents failed to carry their burden with regard to home time-shifting. The District Court described respondents' evidence as follows:

> "Plaintiffs' experts admitted at several points in the trial that the time-shifting without librarying would result in 'not a great deal of harm.' Plaintiffs' greatest concern about time-shifting is with 'a point of important philosophy that transcends even commercial judgment.' They fear that with any Betamax usage, 'invisible boundaries' are passed: 'the copyright owner has lost control over his program.'" 480 F. Supp., at 467.

---

[34] Cf. A. Latman, Fair Use of Copyrighted Works (1958), reprinted in Study No. 14 for the Senate Committee on the Judiciary, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights, 86th Cong., 2d Sess., 30 (1960):

"In certain situations, the copyright owner suffers no substantial harm from the use of his work. . . . Here again, is the partial marriage between the doctrine of fair use and the legal maxim *de minimus non curat lex.*"

452

Later in its opinion, the District Court observed:

"Most of plaintiffs' predictions of harm hinge on specu-
lation about audience viewing patterns and ratings, a
measurement system which Sidney Sheinberg, MCA's
president, calls a 'black art' because of the significant
level of imprecision involved in the calculations." *Id.*,
at 469.[35]

There was no need for the District Court to say much about
past harm. "Plaintiffs have admitted that no actual harm to
their copyrights has occurred to date." *Id.*, at 451.

On the question of potential future harm from time-shifting,
the District Court offered a more detailed analysis of the
evidence. It rejected respondents' "fear that persons 'watch-
ing' the original telecast of a program will not be meas-
ured in the live audience and the ratings and revenues will
decrease," by observing that current measurement technol-
ogy allows the Betamax audience to be reflected. *Id.*, at
466.[36] It rejected respondents' prediction "that live televi-

[35] See also 480 F. Supp., at 451:
"It should be noted, however, that plaintiffs' argument is more complicated
and speculative than was the plaintiff's in *Williams & Wilkins*. . . . Here,
plaintiffs ask the court to find harm based on many more assumptions. . . .
As is discussed more fully in Part IV *infra*, some of these assumptions are
based on neither fact nor experience, and plaintiffs admit that they are to
some extent inconsistent and illogical."
[36] "There was testimony at trial, however, that Nielsen Ratings has
already developed the ability to measure when a Betamax in a sample
home is recording the program. Thus, the Betamax owner will be meas-
ured as a part of the live audience. The later diary can augment that
measurement with information about subsequent viewing." *Id.*, at 466.
In a separate section, the District Court rejected plaintiffs' suggestion
that the commercial attractiveness of television broadcasts would be dimin-
ished because Betamax owners would use the pause button or fast-forward
control to avoid viewing advertisements:
"It must be remembered, however, that to omit commercials, Betamax
owners must view the program, including the commercials, while record-
ing. To avoid commercials during playback, the viewer must fast-forward

sion or movie audiences will decrease as more people watch Betamax tapes as an alternative," with the observation that "[t]here is no factual basis for [the underlying] assumption." *Ibid.*[37] It rejected respondents' "fear that time-shifting will reduce audiences for telecast reruns," and concluded instead that "given current market practices, this should aid plaintiffs rather than harm them." *Ibid.*[38] And it declared that respondents' suggestion that "theater or film rental exhibition of a program will suffer because of time-shift recording of that program" "lacks merit." *Id.*, at 467.[39]

---

and, for the most part, guess as to when the commercial has passed. For most recordings, either practice may be too tedious. As defendants' survey showed, 92% of the programs were recorded with commercials and only 25% of the owners fast-forward through them. Advertisers will have to make the same kinds of judgments they do now about whether persons viewing televised programs actually watch the advertisements which interrupt them." *Id.*, at 468.

[37] "Here plaintiffs assume that people will view copies when they would otherwise be watching television or going to the movie theater. There is no factual basis for this assumption. It seems equally likely that Betamax owners will play their tapes when there is nothing on television they wish to see and no movie they want to attend. Defendants' survey does not show any negative effect of Betamax ownership on television viewing or theater attendance." *Id.*, at 466.

[38] "The underlying assumptions here are particularly difficult to accept. Plaintiffs explain that the Betamax increases access to the original televised material and that the more people there are in this original audience, the fewer people the rerun will attract. Yet current marketing practices, including the success of syndication, show just the opposite. Today, the larger the audience for the original telecast, the higher the price plaintiffs can demand from broadcasters from rerun rights. There is no survey within the knowledge of this court to show that the rerun audience is comprised of persons who have not seen the program. In any event, if ratings can reflect Betamax recording, original audiences may increase and, given market practices, this should aid plaintiffs rather than harm them." *Ibid.*

[39] "This suggestion lacks merit. By definition, time-shift recording entails viewing and erasing, so the program will no longer be on tape when the later theater run begins. Of course, plaintiffs may fear that the Betamax owners will keep the tapes long enough to satisfy all their interest in

After completing that review, the District Court restated its overall conclusion several times, in several different ways. "Harm from time-shifting is speculative and, at best, minimal." *Ibid.* "The audience benefits from the time-shifting capability have already been discussed. It is not implausible that benefits could also accrue to plaintiffs, broadcasters, and advertisers, as the Betamax makes it possible for more persons to view their broadcasts." *Ibid.* "No likelihood of harm was shown at trial, and plaintiffs admitted that there had been no actual harm to date." *Id.*, at 468–469. "Testimony at trial suggested that Betamax may require adjustments in marketing strategy, but it did not establish even a likelihood of harm." *Id.*, at 469. "Television production by plaintiffs today is more profitable than it has ever been, and, in five weeks of trial, there was no concrete evidence to suggest that the Betamax will change the studios' financial picture." *Ibid.*

The District Court's conclusions are buttressed by the fact that to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits. In *Community Television of Southern California* v. *Gottfried*, 459 U. S. 498, 508, n. 12 (1983), we acknowledged the public interest in making television broadcasting more available. Concededly, that interest is not unlimited. But it supports an interpretation of the concept of "fair use" that requires the copyright holder to demonstrate some likelihood of harm before he may condemn a private act of time-shifting as a violation of federal law.

When these factors are all weighed in the "equitable rule of reason" balance, we must conclude that this record amply

---

the program and will, therefore, not patronize later theater exhibitions. To the extent that this practice involves librarying, it is addressed in section V. C., *infra.* It should also be noted that there is no evidence to suggest that the public interest in later theatrical exhibitions of motion pictures will be reduced any more by Betamax recording than it already is by the television broadcast of the film." *Id.*, at 467.

supports the District Court's conclusion that home time-shifting is fair use. In light of the findings of the District Court regarding the state of the empirical data, it is clear that the Court of Appeals erred in holding that the statute as presently written bars such conduct.[40]

---

[40] The Court of Appeals chose not to engage in any "equitable rule of reason" analysis in this case. Instead, it assumed that the category of "fair use" is rigidly circumscribed by a requirement that every such use must be "productive." It therefore concluded that copying a television program merely to enable the viewer to receive information or entertainment that he would otherwise miss because of a personal scheduling conflict could never be fair use. That understanding of "fair use" was erroneous.

Congress has plainly instructed us that fair use analysis calls for a sensitive balancing of interests. The distinction between "productive" and "unproductive" uses may be helpful in calibrating the balance, but it cannot be wholly determinative. Although copying to promote a scholarly endeavor certainly has a stronger claim to fair use than copying to avoid interrupting a poker game, the question is not simply two-dimensional. For one thing, it is not true that all copyrights are fungible. Some copyrights govern material with broad potential secondary markets. Such material may well have a broader claim to protection because of the greater potential for commercial harm. Copying a news broadcast may have a stronger claim to fair use than copying a motion picture. And, of course, not all uses are fungible. Copying for commercial gain has a much weaker claim to fair use than copying for personal enrichment. But the notion of social "productivity" cannot be a complete answer to this analysis. A teacher who copies to prepare lecture notes is clearly productive. But so is a teacher who copies for the sake of broadening his personal understanding of his specialty. Or a legislator who copies for the sake of broadening her understanding of what her constituents are watching; or a constituent who copies a news program to help make a decision on how to vote.

Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying. In a hospital setting, using a VTR to enable a patient to see programs he would otherwise miss has no productive purpose other than contributing to the psychological well-being of the patient. Virtually any time-shifting that increases viewer access to television programming may result in a comparable benefit. The statutory language does not identify any dichotomy between productive and

In summary, the record and findings of the District Court lead us to two conclusions. First, Sony demonstrated a significant likelihood that substantial numbers of copyright holders who license their works for broadcast on free television would not object to having their broadcasts time-shifted by private viewers. And second, respondents failed to demonstrate that time-shifting would cause any likelihood of non-minimal harm to the potential market for, or the value of, their copyrighted works. The Betamax is, therefore, capable of substantial noninfringing uses. Sony's sale of such equipment to the general public does not constitute contributory infringement of respondents' copyrights.

## V

"The direction of Art. I is that *Congress* shall have the power to promote the progress of science and the useful arts. When, as here, the Constitution is permissive, the sign of how far Congress has chosen to go can come only from Congress." *Deepsouth Packing Co.* v. *Laitram Corp.*, 406 U. S. 518, 530 (1972).

One may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home, or have enacted a flat prohibition against the sale of machines that make such copying possible.

It may well be that Congress will take a fresh look at this new technology, just as it so often has examined other innovations in the past. But it is not our job to apply laws that have not yet been written. Applying the copyright statute, as it now reads, to the facts as they have been developed in this case, the judgment of the Court of Appeals must be reversed.

*It is so ordered.*

_____

nonproductive time-shifting, but does require consideration of the economic consequences of copying.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

A restatement of the facts and judicial history of this case is necessary, in my view, for a proper focus upon the issues. Respondents' position is hardly so "unprecedented," *ante,* at 421, in the copyright law, nor does it really embody a "gross generalization," *ante,* at 436, or a "novel theory of liability," *ante,* at 437, and the like, as the Court, in belittling their claims, describes the efforts of respondents.

## I

The introduction of the home videotape recorder (VTR) upon the market has enabled millions of Americans to make recordings of television programs in their homes, for future and repeated viewing at their own convenience. While this practice has proved highly popular with owners of television sets and VTR's, it understandably has been a matter of concern for the holders of copyrights in the recorded programs. A result is the present litigation, raising the issues whether the home recording of a copyrighted television program is an infringement of the copyright, and, if so, whether the manufacturers and distributors of VTR's are liable as contributory infringers. I would hope that these questions ultimately will be considered seriously and in depth by the Congress and be resolved there, despite the fact that the Court's decision today provides little incentive for congressional action. Our task in the meantime, however, is to resolve these issues as best we can in the light of ill-fitting existing copyright law.

It is no answer, of course, to refer to and stress, as the Court does, this Court's "consistent deference to Congress" whenever "major technological innovations" appear. *Ante,* at 431. Perhaps a better and more accurate description is that the Court has tended to evade the hard issues when they arise in the area of copyright law. I see no reason for the Court to be particularly pleased with this tradition or to continue it. Indeed, it is fairly clear from the legislative history of the 1976 Act that Congress meant to change the old pattern and

enact a statute that would cover new technologies, as well as old.

## II

In 1976, respondents Universal City Studios, Inc., and Walt Disney Productions (Studios) brought this copyright infringement action in the United States District Court for the Central District of California against, among others, petitioners Sony Corporation, a Japanese corporation, and Sony Corporation of America, a New York corporation, the manufacturer and distributor, respectively, of the Betamax VTR. The Studios sought damages, profits, and a wide-ranging injunction against further sales or use of the Betamax or Betamax tapes.

The Betamax, like other VTR's, presently is capable of recording television broadcasts off the air on videotape cassettes, and playing them back at a later time.[1] *Two* kinds of Betamax usage are at issue here.[2] The first is "time-shifting," whereby the user records a program in order to watch it at a later time, and then records over it, and thereby erases the program, after a single viewing. The second is "library-

---

[1] The Betamax has three primary components: a tuner that receives television ("RF") signals broadcast over the airwaves; an adapter that converts the RF signals into audio-video signals; and a recorder that places the audio-video signals on magnetic tape. Sony also manufactures VTR's without built-in tuners; these are capable of playing back prerecorded tapes and recording home movies on videotape, but cannot record off the air. Since the Betamax has its own tuner, it can be used to record off one channel while another channel is being watched.

The Betamax is available with auxiliary features, including a timer, a pause control, and a fast-forward control; these allow Betamax owners to record programs without being present, to avoid (if they are present) recording commercial messages, and to skip over commercials while playing back the recording. Videotape is reusable; the user erases its record by recording over it.

[2] This case involves only the home recording for home use of television programs broadcast free over the airwaves. No issue is raised concerning cable or pay television, or the sharing or trading of tapes.

building," in which the user records a program in order to keep it for repeated viewing over a longer term. Sony's advertisements, at various times, have suggested that Betamax users "record favorite shows" or "build a library." Sony's Betamax advertising has never contained warnings about copyright infringement, although a warning does appear in the Betamax operating instructions.

The Studios produce copyrighted "movies" and other works that they release to theaters and license for television broadcast. They also rent and sell their works on film and on prerecorded videotapes and videodiscs. License fees for television broadcasts are set according to audience ratings, compiled by rating services that do not measure any playbacks of videotapes. The Studios make the serious claim that VTR recording may result in a decrease in their revenue from licensing their works to television and from marketing them in other ways.

After a 5-week trial, the District Court, with a detailed opinion, ruled that home VTR recording did not infringe the Studios' copyrights under either the Act of Mar. 4, 1909 (1909 Act), 35 Stat. 1075, as amended (formerly codified as 17 U. S. C. § 1 *et seq.*), or the Copyright Revision Act of 1976 (1976 Act), 90 Stat. 2541, 17 U. S. C. § 101 *et seq.* (1982 ed.).[3] The District Court also held that even if home VTR recording were an infringement, Sony could not be held liable under theories of direct infringement, contributory infringement, or vicarious liability. Finally, the court concluded that an injunction against sales of the Betamax would be inappropriate even if Sony were liable under one or more of those theories. 480 F. Supp. 429 (1979).

---

[3] At the trial, the Studios proved 32 individual instances where their copyrighted works were recorded on Betamax VTR's. Two of these instances occurred after January 1, 1978, the primary effective date of the 1976 Act; all the others occurred while the 1909 Act was still effective. My analysis focuses primarily on the 1976 Act, but the principles governing copyright protection for these works are the same under either Act.

460

The United States Court of Appeals for the Ninth Circuit reversed in virtually every respect. 659 F. 2d 963 (1981). It held that the 1909 Act and the 1976 Act contained no implied exemption for "home use" recording, that such recording was not "fair use," and that the use of the Betamax to record the Studios' copyrighted works infringed their copyrights. The Court of Appeals also held Sony liable for contributory infringement, reasoning that Sony knew and anticipated that the Betamax would be used to record copyrighted material off the air, and that Sony, indeed, had induced, caused, or materially contributed to the infringing conduct. The Court of Appeals remanded the case to the District Court for appropriate relief; it suggested that the District Court could consider the award of damages or a continuing royalty in lieu of an injunction. *Id.*, at 976.

III

The Copyright Clause of the Constitution, Art. I, § 8, cl. 8, empowers Congress "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." This Nation's initial copyright statute was passed by the First Congress. Entitled "An Act for the encouragement of learning," it gave an author "the sole right and liberty of printing, reprinting, publishing and vending" his "map, chart, book or books" for a period of 14 years. Act of May 31, 1790, § 1, 1 Stat. 124. Since then, as the technology available to authors for creating and preserving their writings has changed, the governing statute has changed with it. By many amendments, and by complete revisions in 1831, 1870, 1909, and 1976,[4] authors' rights have been

---

[4] Act of Feb. 3, 1831, ch. 16, 4 Stat. 436; Act of July 8, 1870, §§ 85–111, 16 Stat. 212–217; Act of Mar. 4, 1909, 35 Stat. 1075 (formerly codified as 17 U. S. C. § 1 *et seq.*); Copyright Revision Act of 1976, 90 Stat. 2541 (codified as 17 U. S. C. § 101 *et seq.* (1982 ed.)).

expanded to provide protection to any "original works of authorship fixed in any tangible medium of expression," including "motion pictures and other audiovisual works." 17 U. S. C. § 102(a) (1982 ed.).[5]

Section 106 of the 1976 Act grants the owner of a copyright a variety of exclusive rights in the copyrighted work,[6] includ-

---

[5] Section 102(a) provides:

"Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

"(1) literary works;

"(2) musical works, including any accompanying words;

"(3) dramatic works, including any accompanying music;

"(4) pantomimes and choreographic works;

"(5) pictorial, graphic, and sculptural works;

"(6) motion pictures and other audiovisual works; and

"(7) sound recordings."

Definitions of terms used in § 102(a)(6) are provided by § 101: "Audiovisual works" are "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." And "motion pictures" are "audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any." Most commercial television programs, if fixed on film or tape at the time of broadcast or before, qualify as "audiovisual works." Since the categories set forth in § 102(a) are not mutually exclusive, a particular television program may also qualify for protection as a dramatic, musical, or other type of work.

[6] Section 106 provides:

"Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

"(1) to reproduce the copyrighted work in copies or phonorecords;

"(2) to prepare derivative works based upon the copyrighted work;

"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

ing the right "to reproduce the copyrighted work in copies or phonorecords."[7]    This grant expressly is made subject to §§ 107–118, which create a number of exemptions and limitations on the copyright owner's rights.   The most important of these sections, for present purposes, is § 107; that section states that "the fair use of a copyrighted work . . . is not an infringement of copyright."[8]

The 1976 Act, like its predecessors,[9] does *not* give the copyright owner full and complete control over all possible

"(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

"(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly."

[7] A "phonorecord" is defined by § 101 as a reproduction of sounds other than sounds accompanying an audiovisual work, while a "copy" is a reproduction of a work in any form other than a phonorecord.

[8] Section 107 provides:

"Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.   In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."

Section 101 makes it clear that the four factors listed in this section are "illustrative and not limitative."

[9] The 1976 Act was the product of a revision effort lasting more than 20 years.   Spurred by the recognition that "significant developments in technology and communications" had rendered the 1909 Act inadequate, S. Rep. No. 94–473, p. 47 (1975); see H. R. Rep. No. 94–1476, p. 47 (1976),

uses of his work. If the work is put to some use not enumerated in § 106, the use is not an infringement. See *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390, 393–395 (1968). Thus, before considering whether home videotaping comes within the scope of the fair use exemption, one first must inquire whether the practice appears to violate the exclusive right, granted in the first instance by § 106(1), "to reproduce the copyrighted work in copies or phonorecords."

A

Although the word "copies" is in the plural in § 106(1), there can be no question that under the Act the making of even a single unauthorized copy is prohibited. The Senate and House Reports explain: "The references to 'copies or phonorecords,' although in the plural, are intended here and throughout the bill to include the singular (1 U. S. C. § 1)."[10]

---

Congress in 1955 authorized the Copyright Office to prepare a series of studies on all aspects of the existing copyright law. Thirty-four studies were prepared and presented to Congress. The Register of Copyrights drafted a comprehensive report with recommendations, House Committee on the Judiciary, Copyright Law Revision, Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess. (Comm. Print 1961) (Register's 1961 Report), and general revision bills were introduced near the end of the 88th Congress in 1964. H. R. 11947/S. 3008, 88th Cong., 2d Sess. (1964). The Register issued a second report in 1965, with revised recommendations. House Committee on the Judiciary, Copyright Law Revision, pt. 6, Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess. (Comm. Print 1965) (Register's Supplementary Report). Action on copyright revision was delayed from 1967 to 1974 by a dispute on cable television, see generally Second Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1975 Revision Bill, ch. V, pp. 2–26 (Draft Oct.–Dec. 1975) (Register's Second Supplementary Report), but a compromise led to passage of the present Act in 1976.

[10] Title 1 U. S. C. § 1 provides in relevant part:

"In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the plural include the singular . . . ."

S. Rep. No. 94–473, p. 58 (1975) (1975 Senate Report); H. R. Rep. No. 94–1476, p. 61 (1976) (1976 House Report). The Reports then describe the reproduction right established by § 106(1):

> "[T]he right 'to reproduce the copyrighted work in copies or phonorecords' means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be 'perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.' As under the present law, a copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or simulation." 1975 Senate Report 58; 1976 House Report 61.

The making of even a single videotape recording at home falls within this definition; the VTR user produces a material object from which the copyrighted work later can be perceived. Unless Congress intended a special exemption for the making of a single copy for personal use, I must conclude that VTR recording is contrary to the exclusive rights granted by § 106(1).

The 1976 Act and its accompanying Reports specify in some detail the situations in which a single copy of a copyrighted work may be made without infringement concerns. Section 108(a), for example, permits a library or archives "to reproduce no more than one copy or phonorecord of a work" for a patron, but only under very limited conditions; an entire work, moreover, can be copied only if it cannot be obtained elsewhere at a fair price.[11] § 108(e); see also § 112(a) (broad-

---

[11] The library photocopying provisions of § 108 do not excuse any person who requests "a copy" from a library if the requester's use exceeds fair use. § 108(f)(2). Moreover, a library is absolved from liability for the un-

caster may "make no more than one copy or phonorecord of a particular transmission program," and only under certain conditions). In other respects, the making of single copies is permissible only within the limited confines of the fair use doctrine. The Senate Report, in a section headed "Single and multiple copying," notes that the fair use doctrine would permit a teacher to make a single copy of a work for use in the classroom, but only if the work was not a "sizable" one such as a novel or treatise. 1975 Senate Report 63–64; accord, 1976 House Report 68–69, 71. Other situations in which the making of a single copy would be fair use are described in the House and Senate Reports.[12] But neither the statute nor its legislative history suggests any intent to create a general exemption for a single copy made for personal or private use.

Indeed, it appears that Congress considered and rejected the very possibility of a special private use exemption. The issue was raised early in the revision process, in one of the studies prepared for Congress under the supervision of the Copyright Office. A. Latman, Fair Use of Copyrighted Works (1958), reprinted in Study No. 14 for the Senate Committee on the Judiciary, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights, 86th Cong., 2d Sess., 1 (1960) (Latman Fair Use Study). This study found no reported case supporting the existence of an exemption for private use, although it noted that "the purpose and nature of a private use, and in some

---

supervised use of its copying equipment provided that the equipment bears a notice informing users that "the making of a copy" may violate the copyright law. § 108(f)(1).

[12] For example, "the making of a single copy or phonorecord by an individual as a free service for a blind person" would be a fair use, as would "a single copy reproduction of an excerpt from a copyrighted work by a calligrapher for a single client" or "a single reproduction of excerpts from a copyrighted work by a student calligrapher or teacher in a learning situation." 1975 Senate Report 66–67; see 1976 House Report 73–74. Application of

cases the small amount taken, might lead a court to apply the general principles of fair use in such a way as to deny liability." *Id.*, at 12. After reviewing a number of foreign copyright laws that contained explicit statutory exemptions for private or personal use, *id.*, at 25, Professor Latman outlined several approaches that a revision bill could take to the general issue of exemptions and fair use. One of these was the adoption of particularized rules to cover specific situations, including "the field of personal use." *Id.*, at 33.[13]

Rejecting the latter alternative, the Register of Copyrights recommended that the revised copyright statute simply mention the doctrine of fair use and indicate its general scope. The Register opposed the adoption of rules and exemptions to cover specific situations,[14] preferring, instead, to rely on the judge-made fair use doctrine to resolve new problems as they arose. See Register's 1961 Report 25; Register's Supplementary Report 27–28.

The Register's approach was reflected in the first copyright revision bills, drafted by the Copyright Office in 1964.

---

the fair use doctrine in these situations, of course, would be unnecessary if the 1976 Act created a general exemption for the making of a single copy.

[13] Professor Latman made special mention of the "personal use" issue because the area was one that "has become disturbed by recent developments . . . . Photoduplication devices may make authors' and publishers' groups apprehensive. The Copyright Charter recently approved by [the International Confederation of Societies of Authors and Composers] emphasizes the concern of authors over 'private' uses which, because of technological developments, are said to be competing seriously with the author's economic interests." Latman Fair Use Study 33–34.

[14] The one exemption proposed by the Register, permitting a library to make a single photocopy of an out-of-print work and of excerpts that a requester certified were needed for research, met with opposition and was not included in the bills initially introduced in Congress. See Register's 1961 Report 26; H. R. 11947/S. 3008, 88th Cong., 2d Sess. (1964); Register's Supplementary Report 26. A library copying provision was restored to the bill in 1969, after pressure from library associations. Register's Second Supplementary Report, ch. III, pp. 10–11; see S. 543, 91st Cong., 1st Sess., § 108 (Comm. Print, Dec. 10, 1969); 1975 Senate Report 48.

These bills, like the 1976 Act, granted the copyright owner the exclusive right to reproduce the copyrighted work, subject only to the exceptions set out in later sections. H. R. 11947/S. 3008, 88th Cong., 2d Sess., § 5(a) (1964). The primary exception was fair use, § 6, containing language virtually identical to § 107 of the 1976 Act. Although the copyright revision bills underwent change in many respects from their first introduction in 1964 to their final passage in 1976, these portions of the bills did not change.[15] I can conclude only that Congress, like the Register, intended to rely on the fair use doctrine, and not on a *per se* exemption for private use, to separate permissible copying from the impermissible.[16]

---

[15] The 1964 bills provided that the fair use of copyrighted material for purposes "such as criticism, comment, news reporting, teaching, scholarship, or research" was not an infringement of copyright, and listed four "factors to be considered" in determining whether any other particular use was fair. H. R. 11947/S. 3008, 88th Cong., 2d Sess., § 6 (1964). Revised bills, drafted by the Copyright Office in 1965, contained a fair use provision merely mentioning the doctrine but not indicating its scope: "Notwithstanding the provisions of section 106, the fair use of a copyrighted work is not an infringement of copyright." H. R. 4347/S. 1006, 89th Cong., 1st Sess., § 107 (1965). The House Judiciary Committee restored the provision to its earlier wording, H. R. Rep. No. 2237, 89th Cong., 2d Sess., 5, 58 (1966), and the language adopted by the Committee remained in the bill in later Congresses. See H. R. 2512/S. 597, 90th Cong., 1st Sess., § 107 (1967); S. 543, 91st Cong., 1st Sess., § 107 (1969); S. 644, 92d Cong., 1st Sess., § 107 (1971); S. 1361, 93d Cong., 1st Sess., § 107 (1973); H. R. 2223/S. 22, 94th Cong., 1st Sess., § 107 (1975). With a few additions by the House Judiciary Committee in 1976, see 1976 House Report 5; H. R. Conf. Rep. No. 94–1733, p. 70 (1976), the same language appears in § 107 of the 1976 Act.

[16] In *Williams & Wilkins Co.* v. *United States*, 203 Ct. Cl. 74, 487 F. 2d 1345 (1973), aff'd by an equally divided Court, 420 U. S. 376 (1975), decided during the process of the revision of the copyright statutes, the Court of Claims suggested that copying for personal use might be outside the scope of copyright protection under the 1909 Act. The court reasoned that because "hand copying" for personal use has always been regarded as permis-

468

When Congress intended special and protective treatment for private use, moreover, it said so explicitly. One such explicit statement appears in § 106 itself. The copyright owner's exclusive right to *perform* a copyrighted work, in contrast to his right to reproduce the work in copies, is limited. Section 106(4) grants a copyright owner the exclusive right to perform the work "publicly," but does not afford the owner protection with respect to private performances by others. A motion picture is "performed" whenever its images are shown or its sounds are made audible. § 101. Like "sing-

---

sible, and because the practice of making personal copies continued after typewriters and photostat machines were developed, the making of personal copies by means other than hand copying should be permissible as well. 203 Ct. Cl., at 84–88, 487 F. 2d, at 1350–1352.

There appear to me to be several flaws in this reasoning. First, it is by no means clear that the making of a "hand copy" of an entire work is permissible; the most that can be said is that there is no reported case on the subject, possibly because no copyright owner ever thought it worthwhile to sue. See Latman Fair Use Study 11–12; 3 M. Nimmer, Copyright § 13.05[E][4][a] (1983). At least one early treatise asserted that infringement would result "if an individual made copies for his personal use, even in his own handwriting, as there is no rule of law excepting manuscript copies from the law of infringement." A. Weil, American Copyright Law § 1066 (1917). Second, hand copying or even copying by typewriter is self-limiting. The drudgery involved in making hand copies ordinarily ensures that only necessary and fairly small portions of a work are taken; it is unlikely that any user would make a hand copy as a substitute for one that could be purchased. The harm to the copyright owner from hand copying thus is minimal. The recent advent of inexpensive and readily available copying machines, however, has changed the dimensions of the problem. See Register's Second Supplementary Report, ch. III, p. 3; Hearings on H. R. 2223 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 94th Cong., 1st Sess., 194 (1975) (1975 House Hearings) (remarks of Rep. Danielson); *id.*, at 234 (statement of Robert W. Cairns); *id.*, at 250 (remarks of Rep. Danielson); *id.*, at 354 (testimony of Irwin Karp); *id.*, at 467 (testimony of Rondo Cameron); *id.*, at 1795 (testimony of Barbara Ringer, Register of Copyrights). Thus, "[t]he supposition that there is no tort involved in a scholar copying a copyrighted text by hand does not much advance the question of machine copying." B. Kaplan, An Unhurried View of Copyright 101–102 (1967).

[ing] a copyrighted lyric in the shower," *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 155 (1975), watching television at home with one's family and friends is now considered a performance. 1975 Senate Report 59–60; 1976 House Report 63.[17] Home television viewing nevertheless does not infringe any copyright—but only because § 106(4) contains the word "publicly."[18] See generally 1975 Senate Report 60–61; 1976 House Report 63–64; Register's 1961 Report 29–30. No such distinction between public and private uses appears in § 106(1)'s prohibition on the making of copies.[19]

Similarly, an explicit reference to private use appears in § 108. Under that section, a library can make a copy for a patron only for specific types of private use: "private study, scholarship, or research."[20] §§ 108(d)(1) and (e)(1); see 37

---

[17] In a trio of cases, *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S. 390, 398 (1968); *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.*, 415 U. S. 394, 403–405 (1974); and *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151 (1975), this Court had held that the reception of a radio or television broadcast was not a "performance" under the 1909 Act. The Court's "narrow construction" of the word "perform" was "completely overturned by the [1976 Act] and its broad definition of 'perform' in section 101." 1976 House Report 87.

[18] A work is performed "publicly" if it takes place "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." § 101.

[19] One purpose of the exemption for private performances was to permit the home viewing of lawfully made videotapes. The Register noted in 1961 that "[n]ew technical devices will probably make it practical in the future to reproduce televised motion pictures in the home. We do not believe the private *use* of such a reproduction can or should be precluded by copyright." Register's 1961 Report 30 (emphasis added). The Register did not suggest that the private *making* of a reproduction of a televised motion picture would be permitted by the copyright law. The Register later reminded Congress that "[i]n general the concept of 'performance' must be distinguished sharply from the reproduction of copies." Register's Supplementary Report 22.

[20] During hearings on this provision, Representative Danielson inquired whether it would apply to works of fiction such as "Gone With the Wind," or whether it was limited to "strictly technical types of information." The

CFR § 201.14(b) (1983). Limits also are imposed on the extent of the copying and the type of institution that may make copies, and the exemption expressly is made inapplicable to motion pictures and certain other types of works. § 108(h). These limitations would be wholly superfluous if an entire copy of any work could be made by any person for private use.[21]

### B

The District Court in this case nevertheless concluded that the 1976 Act contained an implied exemption for "home-use recording." 480 F. Supp., at 444–446. The court relied primarily on the legislative history of a 1971 amendment to the 1909 Act, a reliance that this Court today does not duplicate. *Ante*, at 430, n. 11. That amendment, however, was addressed to the specific problem of commercial piracy of sound recordings. Act of Oct. 15, 1971, 85 Stat. 391 (1971 Amendment). The House Report on the 1971 Amendment, in a section entitled "Home Recording," contains the following statement:

> "In approving the creation of a limited copyright in sound recordings it is the intention of the Committee that this limited copyright not grant any broader rights than are accorded to other copyright proprietors under the existing title 17. Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded per-

---

uncontradicted response was that it would apply only in "general terms of science . . . [and] the useful arts." 1975 House Hearings 251 (testimony of Robert W. Cairns); cf. *id.*, at 300 (statement of Harry Rosenfield) ("We are not asking . . . for the right to copy 'Gone With the Wind' ").

[21] The mention in the Senate and House Reports of situations in which copies for private use would be permissible under the fair use doctrine—for example, the making of a free copy for a blind person, 1975 Senate Report 66; 1976 House Report 73, or the "recordings of performances by music students for purposes of analysis and criticism," 1975 Senate Report 63— would be superfluous as well. See n. 12, *supra*.

formances, where the home recording is for private use and with no purpose of reproducing or otherwise capitalizing commercially on it. This practice is common and unrestrained today, and the record producers and performers would be in no different position from that of the owners of copyright in recorded musical compositions over the past 20 years." H. R. Rep. No. 92–487, p. 7 (1971) (1971 House Report).

Similar statements were made during House hearings on the bill[22] and on the House floor,[23] although not in the Senate

---

[22] The following exchange took place during the testimony of Barbara Ringer, then Assistant Register of Copyrights:

"[Rep.] BIESTER. . . . I can tell you I must have a small pirate in my own home. My son has a cassette tape recorder, and as a particular record becomes a hit, he will retrieve it onto his little set. . . . [T]his legislation, of course, would not point to his activities, would it?

"Miss RINGER. I think the answer is clearly, 'No, it would not.' I have spoken at a couple of seminars on video cassettes lately, and this question is usually asked: 'What about the home recorders?' The answer I have given and will give again is that this is something you cannot control. You simply cannot control it. My own opinion, whether this is philosophical dogma or not, is that sooner or later there is going to be a crunch here. But that is not what this legislation is addressed to, and I do not see the crunch coming in the immediate future. . . . I do not see anybody going into anyone's home and preventing this sort of thing, or forcing legislation that would engineer a piece of equipment not to allow home taping." Hearings on S. 646 and H. R. 6927 before Subcommittee No. 3 of the House Committee on the Judiciary, 92d Cong., 1st Sess., 22–23 (1971) (1971 House Hearings).

[23] Shortly before passage of the bill, a colloquy took place between Representative Kastenmeier, Chairman of the House Subcommittee that produced the bill, and Representative Kazen, who was not on the Subcommittee:

"Mr. KAZEN. Am I correct in assuming that the bill protects copyrighted material that is duplicated for commercial purposes only?

"Mr. KASTENMEIER. Yes.

"Mr. KAZEN. In other words, if your child were to record off of a program which comes through the air on the radio or television, and then used

proceedings. In concluding that these statements created a general exemption for home recording, the District Court, in my view, paid too little heed to the context in which the statements were made, and failed to consider the limited purpose of the 1971 Amendment and the structure of the 1909 Act.

Unlike television broadcasts and other types of motion pictures, sound recordings were not protected by copyright prior to the passage of the 1971 Amendment. Although the underlying musical work could be copyrighted, the 1909 Act provided no protection for a particular performer's rendition of the work. Moreover, copyrighted musical works that had been recorded for public distribution were subject to a "compulsory license": any person was free to record such a work upon payment of a 2-cent royalty to the copyright owner. § 1(e), 35 Stat. 1075–1076. While reproduction without payment of the royalty was an infringement under the 1909 Act, damages were limited to three times the amount of the unpaid royalty. § 25(e), 35 Stat. 1081–1082; *Shapiro, Bernstein & Co.* v. *Goody*, 248 F. 2d 260, 262–263, 265 (CA2 1957), cert. denied, 355 U. S. 952 (1958). It was observed that the practical effect of these provisions was to legalize record piracy. See S. Rep. No. 92–72, p. 4 (1971); 1971 House Report 2.

In order to suppress this piracy, the 1971 Amendment extended copyright protection beyond the underlying work and to the sound recordings themselves. Congress chose, however, to provide only limited protection: owners of copyright in sound recordings were given the exclusive right "[t]o reproduce [their works] and distribute [them] to the public."

---

it for her own personal pleasure, for listening pleasure, this use would not be included under the penalties of this bill?

"Mr. KASTENMEIER. This is not included in the bill. I am glad the gentleman raises the point.

"On page 7 of the report, under 'Home Recordings,' Members will note that under the bill the same practice which prevails today is called for; namely, this is considered both presently and under the proposed law to be fair use. The child does not do this for commercial purposes. This is made clear in the report." 117 Cong. Rec. 34748–34749 (1971).

1971 Amendment, § 1(a), 85 Stat. 391 (formerly codified as 17
U. S. C. § 1(f)).[24]  This right was merely the right of com-
mercial distribution.  See 117 Cong. Rec. 34748–34749 (1971)
(colloquy of Reps. Kazen and Kastenmeier) ("the bill pro-
tects copyrighted material that is duplicated for commercial
purposes only").

Against this background, the statements regarding home
recording under the 1971 Amendment appear in a very dif-
ferent light.  If home recording was "common and unre-
strained" under the 1909 Act, see 1971 House Report 7, it
was because sound recordings had no copyright protection
and the owner of a copyright in the underlying musical work
could collect no more than a 2-cent royalty plus 6 cents in
damages for each unauthorized use.  With so little at stake,
it is not at all surprising that the Assistant Register "d[id]
not see anybody going into anyone's home and preventing
this sort of thing."  1971 House Hearings 23.

But the references to home sound recording in the 1971
Amendment's legislative history demonstrate no congres-
sional intent to create a generalized home-use exemption
from copyright protection.  Congress, having recognized
that the 1909 Act had been unsuccessful in controlling home
sound recording, addressed only the specific problem of com-
mercial record piracy.  To quote Assistant Register Ringer
again, home use was "not what this legislation [was] ad-
dressed to."  *Id.*, at 22.[25]

[24] The 1909 Act's grant of an exclusive right to "copy," § 1(a), was of
no assistance to the owner of a copyright in a sound recording, because a
reproduction of a sound recording was technically considered not to be
a "copy."  See 1971 House Hearings 18 (testimony of Barbara Ringer,
Assistant Register of Copyrights); 1971 Amendment, § 1(e), 85 Stat. 391
(formerly codified as 17 U. S. C. § 26) ("For the purposes of [specified
sections, not including § 1(a)], but not for any other purpose, a reproduc-
tion of a [sound recording] shall be considered to be a copy thereof").  This
concept is carried forward into the 1976 Act, which distinguishes between
"copies" and "phonorecords."  See n. 7, *supra.*

[25] During consideration of the 1976 Act, Congress, of course, was well
aware of the limited nature of the protection granted to sound recordings

While the 1971 Amendment narrowed the sound recordings loophole in then existing copyright law, motion pictures and other audiovisual works have been accorded full copyright protection since at least 1912, see Act of Aug. 24, 1912, 37 Stat. 488, and perhaps before, see *Edison* v. *Lubin*, 122 F. 240 (CA3 1903), appeal dism'd, 195 U. S. 625 (1904). Congress continued this protection in the 1976 Act. Unlike the sound recording rights created by the 1971 Amendment, the reproduction rights associated with motion pictures under § 106(1) are not limited to reproduction for *public* distribution; the copyright owner's right to reproduce the work exists independently, and the "mere duplication of a copy may constitute an infringement even if it is never distributed." Register's Supplementary Report 16; see 1975 Senate Report 57 and 1976 House Report 61. Moreover, the 1976 Act was intended as a comprehensive treatment of all aspects of copyright law. The Reports accompanying the 1976 Act, unlike the 1971 House Report, contain no suggestion that home-use recording is somehow outside the scope of this all-inclusive statute. It was clearly the intent of Congress that no additional exemptions were to be implied.[26]

---

under the 1971 Amendment. See 1975 House Hearings 113 (testimony of Barbara Ringer, Register of Copyrights) (1971 Amendment "created a copyright in a sound recording . . . but limited it to the particular situation of so-called piracy"); *id.,* at 1380 (letter from John Lorenz, Acting Librarian of Congress) (under 1971 Amendment "only the unauthorized reproduction and distribution to the public of copies of the sound recording is prohibited. Thus, the duplication of sound recordings for private, personal use and the performance of sound recordings through broadcasting or other means are outside the scope of the amendment").

[26] Representative Kastenmeier, the principal House sponsor of the 1976 revision bill and Chairman of the House Subcommittee that produced it, made this explicit on the opening day of the House hearings:

"[F]rom time to time, certain areas have not been covered in the bill. But is it not the case, this being a unified code, that the operation of the bill does apply whether or not we specifically deal with a subject or not? . . .

"Therefore, we can really not fail to deal with an issue. It will be dealt

I therefore find in the 1976 Act no implied exemption to cover the home taping of television programs, whether it be for a single copy, for private use, or for home use. Taping a copyrighted television program is infringement unless it is permitted by the fair use exemption contained in § 107 of the 1976 Act. I now turn to that issue.

## IV

## Fair Use

The doctrine of fair use has been called, with some justification, "the most troublesome in the whole law of copyright." *Dellar* v. *Samuel Goldwyn, Inc.*, 104 F. 2d 661, 662 (CA2 1939); see *Triangle Publications, Inc.* v. *Knight-Ridder Newspapers, Inc.*, 626 F. 2d 1171, 1174 (CA5 1980); *Meeropol* v. *Nizer*, 560 F. 2d 1061, 1068 (CA2 1977), cert. denied, 434 U. S. 1013 (1978). Although courts have constructed lists of factors to be considered in determining whether a particular use is fair,[27] no fixed criteria have emerged by which that

---

with one way or the other. The code, title 17, will cover it. So we have made a conscientious decision even by omission. . . .

    .        .        .        .        .

". . . By virtue of passing this bill, we will deal with every issue. Whether we deal with it completely or not for the purpose of resolving the issues involved is the only question, not whether it has dealt with the four corners of the bill because the four corners of the bill will presume to deal with everything in copyright." *Id.*, at 115.

[27] The precise phrase "fair use" apparently did not enter the case law until 1869, see *Lawrence* v. *Dana*, 15 F. Cas. 26, 60 (No. 8,136) (CC Mass.), but the doctrine itself found early expression in *Folsom* v. *Marsh*, 9 F. Cas. 342 (No. 4,901) (CC Mass. 1841). Justice Story was faced there with the "intricate and embarrassing questio[n]" whether a biography containing copyrighted letters was "a justifiable use of the original materials, such as the law recognizes as no infringement of the copyright of the plaintiffs." *Id.*, at 344, 348. In determining whether the use was permitted, it was necessary, said Justice Story, to consider "the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or

determination can be made. This Court thus far has provided no guidance; although fair use issues have come here twice, on each occasion the Court was equally divided and no opinion was forthcoming. *Williams & Wilkins Co.* v. *United States*, 203 Ct. Cl. 74, 487 F. 2d 1345 (1973), aff'd, 420 U. S. 376 (1975); *Benny* v. *Loew's Inc.*, 239 F. 2d 532 (CA9 1956), aff'd *sub nom. Columbia Broadcasting System, Inc.* v. *Loew's Inc.*, 356 U. S. 43 (1958).

Nor did Congress provide definitive rules when it codified the fair use doctrine in the 1976 Act; it simply incorporated a list of factors "to be considered": the "purpose and character of the use," the "nature of the copyrighted work," the "amount and substantiality of the portion used," and, perhaps the most important, the "effect of the use upon the *potential* market for or value of the copyrighted work" (emphasis supplied). § 107. No particular weight, however, was assigned to any of these, and the list was not intended to be exclusive. The House and Senate Reports explain that § 107 does no more than give "statutory recognition" to the fair use doctrine; it was intended "to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." 1976 House Report 66. See 1975 Senate Report 62; S. Rep. No. 93–983, p. 116 (1974); H. R. Rep. No. 83, 90th Cong., 1st Sess., 32 (1967); H. R. Rep. No. 2237, 89th Cong., 2d Sess., 61 (1966).

---

supersede the objects, of the original work. . . . Much must, in such cases, depend upon the nature of the new work, the value and extent of the copies, and the degree in which the original authors may be injured thereby." *Id.*, at 348–349.

Similar lists were compiled by later courts. See, *e. g., Tennessee Fabricating Co.* v. *Moultrie Mfg. Co.*, 421 F. 2d 279, 283 (CA5), cert. denied, 398 U. S. 928 (1970); *Mathews Conveyer Co.* v. *Palmer-Bee Co.*, 135 F. 2d 73, 85 (CA6 1943); *Columbia Pictures Corp.* v. *National Broadcasting Co.*, 137 F. Supp. 348 (SD Cal. 1955); *Shapiro, Bernstein & Co.* v. *P. F. Collier & Son Co.*, 26 USPQ 40, 43 (SDNY 1934); *Hill* v. *Whalen & Martell, Inc.*, 220 F. 359, 360 (SDNY 1914).

A

Despite this absence of clear standards, the fair use doctrine plays a crucial role in the law of copyright. The purpose of copyright protection, in the words of the Constitution, is to "promote the Progress of Science and useful Arts." Copyright is based on the belief that by granting authors the exclusive rights to reproduce their works, they are given an incentive to create, and that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and the useful Arts.'" *Mazer* v. *Stein*, 347 U. S. 201, 219 (1954). The monopoly created by copyright thus rewards the individual author in order to benefit the public. *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S., at 156; *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 127–128 (1932); see H. R. Rep. No. 2222, 60th Cong., 2d Sess., 7 (1909).

There are situations, nevertheless, in which strict enforcement of this monopoly would inhibit the very "Progress of Science and useful Arts" that copyright is intended to promote. An obvious example is the researcher or scholar whose own work depends on the ability to refer to and to quote the work of prior scholars. Obviously, no author could create a new work if he were first required to repeat the research of every author who had gone before him.[28] The scholar, like the ordinary user, of course could be left to bargain with each copyright owner for permission to quote from or refer to prior works. But there is a crucial difference between the scholar and the ordinary user. When the ordinary user decides that the owner's price is too high, and forgoes use of the work, only the individual is the loser. When the scholar forgoes the use of a prior work, not only does his own

---

[28] "The world goes ahead because each of us builds on the work of our predecessors. 'A dwarf standing on the shoulders of a giant can see farther than the giant himself.'" Chafee, Reflections on the Law of Copyright: I, 45 Colum. L. Rev. 503, 511 (1945).

work suffer, but the public is deprived of his contribution to knowledge. The scholar's work, in other words, produces external benefits from which everyone profits. In such a case, the fair use doctrine acts as a form of subsidy—albeit at the first author's expense—to permit the second author to make limited use of the first author's work for the public good. See Latman Fair Use Study 31; Gordon, Fair Use as Market Failure: A Structural Analysis of the *Betamax* Case and its Predecessors, 82 Colum. L. Rev. 1600, 1630 (1982).

A similar subsidy may be appropriate in a range of areas other than pure scholarship. The situations in which fair use is most commonly recognized are listed in § 107 itself; fair use may be found when a work is used "for purposes such as criticism, comment, news reporting, teaching, . . . scholarship, or research." The House and Senate Reports expand on this list somewhat,[29] and other examples may be found in the case law.[30] Each of these uses, however, reflects a common theme: each is a *productive* use, resulting in some added benefit to the public beyond that produced by the first author's work.[31] The fair use doctrine, in other words, permits works

---

[29] Quoting from the Register's 1961 Report, the Senate and House Reports give examples of possible fair uses:

" 'quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported.' " 1975 Senate Report 61–62; 1976 House Report 65.

[30] See, *e. g.*, *Triangle Publications, Inc.* v. *Knight-Ridder Newspapers, Inc.*, 626 F. 2d 1171 (CA5 1980) (comparative advertising).

[31] Professor Seltzer has characterized these lists of uses as "reflect[ing] what in fact the subject matter of fair use has in the history of its adjudication consisted in: it has always had to do with the use by a second author of

to be used for "socially laudable purposes." See Copyright Office, Briefing Papers on Current Issues, reprinted in 1975 House Hearings 2051, 2055. I am aware of no case in which the reproduction of a copyrighted work for the sole benefit of the user has been held to be fair use.[32]

I do not suggest, of course, that every productive use is a fair use. A finding of fair use still must depend on the facts of the individual case, and on whether, under the circumstances, it is reasonable to expect the user to bargain with the copyright owner for use of the work. The fair use doctrine must strike a balance between the dual risks created by the copyright system: on the one hand, that depriving authors of their monopoly will reduce their incentive to create, and, on the other, that granting authors a complete monopoly will reduce the creative ability of others.[33] The inquiry is

---

a first author's work." L. Seltzer, Exemptions and Fair Use in Copyright 24 (1978) (emphasis removed). He distinguishes "the mere reproduction of a work in order to use it for its intrinsic purpose—to make what might be called the 'ordinary' use of it." When copies are made for "ordinary" use of the work, "ordinary *infringement* has customarily been triggered, not notions of fair use" (emphasis in original). *Ibid.* See also 3 M. Nimmer, Copyright § 13.05[A][1] (1983) ("Use of a work in each of the foregoing contexts either necessarily or usually involves its use in a derivative work").

[32] *Williams & Wilkins Co.* v. *United States,* 203 Ct. Cl. 74, 487 F. 2d 1345 (1973), aff'd by an equally divided Court, 420 U. S. 376 (1975), involved the photocopying of scientific journal articles; the Court of Claims stressed that the libraries performing the copying were "devoted solely to the advancement and dissemination of medical knowledge," 203 Ct. Cl., at 91, 487 F. 2d, at 1354, and that "medical science would be seriously hurt if such library photocopying were stopped." *Id.,* at 95, 487 F. 2d, at 1356.

The issue of library copying is now covered by § 108 of the 1976 Act. That section, which Congress regarded as "authoriz[ing] certain photocopying practices which may not qualify as a fair use," 1975 Senate Report 67; 1976 House Report 74, permits the making of copies only for "private study, scholarship, or research." §§ 108(d)(1) and (e)(1).

[33] In the words of Lord Mansfield: "[W]e must take care to guard against two extremes equally prejudicial; the one, that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits, and the reward of their ingenuity and labour; the

necessarily a flexible one, and the endless variety of situations that may arise precludes the formulation of exact rules. But when a user reproduces an entire work and uses it for its original purpose, with no added benefit to the public, the doctrine of fair use usually does not apply. There is then no need whatsoever to provide the ordinary user with a fair use subsidy at the author's expense.

The making of a videotape recording for home viewing is an ordinary rather than a productive use of the Studios' copyrighted works. The District Court found that "Betamax owners use the copy for the same purpose as the original. They add nothing of their own." 480 F. Supp., at 453. Although applying the fair use doctrine to home VTR recording, as Sony argues, may increase public access to material broadcast free over the public airwaves, I think Sony's argument misconceives the nature of copyright. Copyright gives the author a right to limit or even to cut off access to his work. *Fox Film Corp.* v. *Doyal*, 286 U. S., at 127. A VTR recording creates no public benefit sufficient to justify limiting this right. Nor is this right extinguished by the copyright owner's choice to make the work available over the airwaves. Section 106 of the 1976 Act grants the copyright owner the exclusive right to control the performance and the reproduction of his work, and the fact that he has licensed a single television performance is really irrelevant to the existence of his right to control its reproduction. Although a television broadcast may be free to the viewer, this fact is equally irrelevant; a book borrowed from the public library may not be copied any more freely than a book that is purchased.

It may be tempting, as, in my view, the Court today is tempted, to stretch the doctrine of fair use so as to permit unfettered use of this new technology in order to increase ac-

---

other, that the world may not be deprived of improvements, nor the progress of the arts be retarded." *Sayre* v. *Moore*, as set forth in *Cary* v. *Longman*, 1 East 358, 361, n. (b), 102 Eng. Rep. 138, 140, n. (b) (K. B. 1785). See Register's Supplementary Report 13.

cess to television programming. But such an extension risks eroding the very basis of copyright law, by depriving authors of control over their works and consequently of their incentive to create.[34] Even in the context of highly productive educational uses, Congress has avoided this temptation; in passing the 1976 Act, Congress made it clear that off-the-air videotaping was to be permitted only in very limited situations. See 1976 House Report 71; 1975 Senate Report 64. And, the Senate Report adds, "[t]he committee does not intend to suggest . . . that off-the-air recording for convenience would under any circumstances, be considered 'fair use.'" *Id.*, at 66. I cannot disregard these admonitions.

## B

I recognize, nevertheless, that there are situations where permitting even an unproductive use would have no effect on the author's incentive to create, that is, where the use would not affect the value of, or the market for, the author's work. Photocopying an old newspaper clipping to send to a friend

---

[34] This point was brought home repeatedly by the Register of Copyrights. Mentioning the "multitude of technological developments" since passage of the 1909 Act, including "remarkable developments in the use of video tape," Register's Supplementary Report xiv–xv, the Register cautioned:

"I realize, more clearly now than I did in 1961, that the revolution in communications has brought with it a serious challenge to the author's copyright. This challenge comes not only from the ever-growing commercial interests who wish to use the author's works for private gain. An equally serious attack has come from people with a sincere interest in the public welfare who fully recognize . . . 'that the real heart of civilization . . . owes its existence to the author'; ironically, in seeking to make the author's works widely available by freeing them from copyright restrictions, they fail to realize that they are whittling away the very thing that nurtures authorship in the first place. An accommodation among conflicting demands must be worked out, true enough, but not by denying the fundamental constitutional directive: to encourage cultural progress by securing the author's exclusive rights to him for a limited time." *Id.*, at xv; see 1975 House Hearings 117 (testimony of Barbara Ringer, Register of Copyrights).

may be an example; pinning a quotation on one's bulletin board may be another. In each of these cases, the effect on the author is truly *de minimis*. Thus, even though these uses provide no benefit to the public at large, no purpose is served by preserving the author's monopoly, and the use may be regarded as fair.

Courts should move with caution, however, in depriving authors of protection from unproductive "ordinary" uses. As has been noted above, even in the case of a productive use, § 107(4) requires consideration of "the effect of the use upon the *potential* market for or value of the copyrighted work" (emphasis added). "[A] particular use which may seem to have little or no economic impact on the author's rights today can assume tremendous importance in times to come." Register's Supplementary Report 14. Although such a use may seem harmless when viewed in isolation, "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." 1975 Senate Report 65.

I therefore conclude that, at least when the proposed use is an unproductive one, a copyright owner need prove only a *potential* for harm to the market for or the value of the copyrighted work. See 3 M. Nimmer, Copyright § 13.05[E][4][c], p. 13–84 (1983). Proof of actual harm, or even probable harm, may be impossible in an area where the effect of a new technology is speculative, and requiring such proof would present the "real danger . . . of confining the scope of an author's rights on the basis of the present technology so that, as the years go by, his copyright loses much of its value because of unforeseen technical advances." Register's Supplementary Report 14. Infringement thus would be found if the copyright owner demonstrates a reasonable possibility that harm will result from the proposed use. When the use is one that creates no benefit to the public at large, copyright protection should not be denied on the basis that a new technology that may result in harm has not yet done so.

The Studios have identified a number of ways in which VTR recording could damage their copyrights. VTR recording could reduce their ability to market their works in movie theaters and through the rental or sale of prerecorded videotapes or videodiscs; it also could reduce their rerun audience, and consequently the license fees available to them for repeated showings. Moreover, advertisers may be willing to pay for only "live" viewing audiences, if they believe VTR viewers will delete commercials or if rating services are unable to measure VTR use; if this is the case, VTR recording could reduce the license fees the Studios are able to charge even for first-run showings. Library-building may raise the potential for each of the types of harm identified by the Studios, and time-shifting may raise the potential for substantial harm as well.[35]

Although the District Court found no likelihood of harm from VTR use, 480 F. Supp., at 468, I conclude that it applied an incorrect substantive standard and misallocated the

[35] A VTR owner who has taped a favorite movie for repeated viewing will be less likely to rent or buy a tape containing the same movie, watch a televised rerun, or pay to see the movie at a theater. Although time-shifting may not replace theater or rerun viewing or the purchase of prerecorded tapes or discs, it may well replace rental usage; a VTR user who has recorded a first-run movie for later viewing will have no need to rent a copy when he wants to see it. Both library-builders and time-shifters may avoid commercials; the library-builder may use the pause control to record without them, and all users may fast-forward through commercials on playback.

The Studios introduced expert testimony that both time-shifting and librarying would tend to decrease their revenue from copyrighted works. See 480 F. Supp., at 440. The District Court's findings also show substantial library-building and avoidance of commercials. Both sides submitted surveys showing that the average Betamax user owns between 25 and 32 tapes. The Studios' survey showed that at least 40% of users had more than 10 tapes in a "library"; Sony's survey showed that more than 40% of users planned to view their tapes more than once; and both sides' surveys showed that commercials were avoided at least 25% of the time. *Id.*, at 438–439.

burden of proof. The District Court reasoned that the Studios had failed to prove that library-building would occur "to any significant extent," *id.*, at 467; that the Studios' prerecorded videodiscs could compete with VTR recordings and were "arguably . . . more desirable," *ibid.*; that it was "not clear that movie audiences will decrease," *id.*, at 468; and that the practice of deleting commercials "may be too tedious" for many viewers, *ibid.* To the extent any decrease in advertising revenues would occur, the court concluded that the Studios had "marketing alternatives at hand to recoup some of that predicted loss." *Id.*, at 452. Because the Studios' prediction of harm was "based on so many assumptions and on a system of marketing which is rapidly changing," the court was "hesitant to identify 'probable effects' of home-use copying." *Ibid.*

The District Court's reluctance to engage in prediction in this area is understandable, but, in my view, the court was mistaken in concluding that the Studios should bear the risk created by this uncertainty. The Studios have demonstrated a potential for harm, which has not been, and could not be, refuted at this early stage of technological development.

The District Court's analysis of harm, moreover, failed to consider the effect of VTR recording on "the *potential* market for or the value of the copyrighted work," as required by § 107(4).[36] The requirement that a putatively infringing use

---

[36] Concern over the impact of a use upon "potential" markets is to be found in cases decided both before and after § 107 lent Congress' imprimatur to the judicially created doctrine of fair use. See, *e. g., Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos.*, 621 F. 2d 57, 60 (CA2 1980) ("the effect of the use on the copyright holder's potential market for the work"); *Meeropol* v. *Nizer*, 560 F. 2d 1061, 1070 (CA2 1977) ("A key issue in fair use cases is whether the defendant's work tends to diminish or prejudice the potential sale of plaintiff's work"), cert. denied, 434 U. S. 1013 (1978); *Williams & Wilkins Co.* v. *United States*, 203 Ct. Cl., at 88, 487 F. 2d, at 1352 ("the effect of the use on a copyright

of a copyrighted work, to be "fair," must not impair a "potential" market for the work has two implications. First, an infringer cannot prevail merely by demonstrating that the copyright holder suffered no net harm from the infringer's action. Indeed, even a showing that the infringement has resulted in a net benefit to the copyright holder will not suffice. Rather, the infringer must demonstrate that he had not impaired the copyright holder's ability to demand compensation from (or to deny access to) any group who would otherwise be willing to pay to see or hear the copyrighted work. Second, the fact that a given market for a copyrighted work would not be available to the copyright holder were it not for the infringer's activities does not permit the infringer to exploit that market without compensating the copyright holder. See *Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos.*, 621 F. 2d 57 (CA2 1980).

In this case, the Studios and their *amici* demonstrate that the advent of the VTR technology created a potential market for their copyrighted programs. That market consists of those persons who find it impossible or inconvenient to watch the programs at the time they are broadcast, and who wish to watch them at other times. These persons are willing to pay for the privilege of watching copyrighted work at their convenience, as is evidenced by the fact that they are willing to pay for VTR's and tapes; undoubtedly, most also would be willing to pay some kind of royalty to copyright holders. The Studios correctly argue that they have been deprived of the ability to exploit this sizable market.

It is thus apparent from the record and from the findings of the District Court that time-shifting does have a substantial

owner's potential market for and value of his work"); *Encyclopaedia Britannica Educational Corp.* v. *Crooks*, 542 F. Supp. 1156, 1173 (WDNY 1982) ("[T]he concern here must be focused on a copyrighted work's *potential* market. It is perfectly possible that plaintiffs' profits would have been greater, but for the kind of videotaping in question") (emphasis in original).

adverse effect upon the "potential market for" the Studios' copyrighted works. Accordingly, even under the formulation of the fair use doctrine advanced by Sony, time-shifting cannot be deemed a fair use.

## V
### Contributory Infringement

From the Studios' perspective, the consequences of home VTR recording are the same as if a business had taped the Studios' works off the air, duplicated the tapes, and sold or rented them to members of the public for home viewing. The distinction is that home VTR users do not record for commercial advantage; the commercial benefit accrues to the manufacturer and distributors of the Betamax. I thus must proceed to discuss whether the manufacturer and distributors can be held contributorily liable if the product they sell is used to infringe.

It is well established that liability for copyright infringement can be imposed on persons other than those who actually carry out the infringing activity. *Kalem Co.* v. *Harper Brothers*, 222 U. S. 55, 62–63 (1911); 3 M. Nimmer, Copyright § 12.04[A] (1983); see *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S., at 160, n. 11; *Buck* v. *Jewell-LaSalle Realty Co.*, 283 U. S. 191, 198 (1931). Although the liability provision of the 1976 Act provides simply that "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright," 17 U. S. C. § 501(a) (1982 ed.), the House and Senate Reports demonstrate that Congress intended to retain judicial doctrines of contributory infringement. 1975 Senate Report 57; 1976 House Report 61.[37]

---

[37] This intent is manifested further by provisions of the 1976 Act that exempt from liability persons who, while not participating directly in any infringing activity, could otherwise be charged with contributory infringement. See § 108(f)(1) (library not liable "for the unsupervised use of re-

The doctrine of contributory copyright infringement, however, is not well defined. One of the few attempts at definition appears in *Gershwin Publishing Corp.* v. *Columbia Artists Management, Inc.*, 443 F. 2d 1159 (CA2 1971). In that case the Second Circuit stated that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Id.*, at 1162 (footnote omitted). While I have no quarrel with this general statement, it does not easily resolve the present case; the District Court and the Court of Appeals, both purporting to apply it, reached diametrically opposite results.

A

In absolving Sony from liability, the District Court reasoned that Sony had no direct involvement with individual Betamax users, did not participate in any off-the-air copying, and did not know that such copying was an infringement of the Studios' copyright. 480 F. Supp., at 460. I agree with the *Gershwin* court that contributory liability may be imposed even when the defendant has no formal control over the infringer. The defendant in *Gershwin* was a concert promoter operating through local concert associations that it sponsored; it had no formal control over the infringing performers themselves. 443 F. 2d, at 1162–1163. See also *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S., at 160, n. 11. Moreover, a finding of contributory infringement has never depended on actual knowledge of particular instances of infringement; it is sufficient that the defendant have reason to know that infringement is taking place. 443 F. 2d,

---

producing equipment located on its premises," provided that certain warnings are posted); § 110(6) ("governmental body" or "nonprofit agricultural or horticultural organization" not liable for infringing performance by concessionaire "in the course of an annual agricultural or horticultural fair or exhibition").

at 1162; see *Screen Gems-Columbia Music, Inc.* v. *Mark-Fi Records, Inc.*, 256 F. Supp. 399 (SDNY 1966).[38]   In the so-called "dance hall" cases, in which questions of contributory infringement arise with some frequency, proprietors of entertainment establishments routinely are held liable for unauthorized performances on their premises, even when they have no knowledge that copyrighted works are being performed.   In effect, the proprietors in those cases are charged with constructive knowledge of the performances.[39]

---

[38] In *Screen Gems*, on which the *Gershwin* court relied, the court held that liability could be imposed on a shipper of unauthorized "bootleg" records and a radio station that broadcast advertisements of the records, provided they knew or should have known that the records were infringing.   The court concluded that the records' low price and the manner in which the records were marketed could support a finding of "constructive knowledge" even if actual knowledge were not shown.

[39] See, *e. g.*, *Famous Music Corp.* v. *Bay State Harness Horse Racing & Breeding Assn., Inc.*, 554 F. 2d 1213 (CA1 1977); *Dreamland Ball Room, Inc.* v. *Shapiro, Bernstein & Co.*, 36 F. 2d 354 (CA7 1929); *M. Witmark & Sons* v. *Tremont Social & Athletic Club*, 188 F. Supp. 787, 790 (Mass. 1960); see also *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 157 (1975); *Buck* v. *Jewell-LaSalle Realty Co.*, 283 U. S. 191, 198–199 (1931); 3 M. Nimmer, Copyright § 12.04[A], p. 12–35 (1983).

Courts have premised liability in these cases on the notion that the defendant had the ability to supervise or control the infringing activities, see, *e. g.*, *Shapiro, Bernstein & Co.* v. *H. L. Green Co.*, 316 F. 2d 304, 307 (CA2 1963); *KECA Music, Inc.* v. *Dingus McGee's Co.*, 432 F. Supp. 72, 74 (WD Mo. 1977).   This notion, however, is to some extent fictional; the defendant cannot escape liability by instructing the performers not to play copyrighted music, or even by inserting a provision to that effect into the performers' contract.   *Famous Music Corp.* v. *Bay State Harness Horse Racing & Breeding Assn., Inc.*, 554 F. 2d, at 1214–1215; *KECA Music, Inc.* v. *Dingus McGee's Co.*, 432 F. Supp., at 75; *Shapiro, Bernstein & Co.* v. *Veltin*, 47 F. Supp. 648, 649 (WD La. 1942).   Congress expressly rejected a proposal to exempt proprietors from this type of liability under the 1976 Act.   See 1975 Senate Report 141–142; 1976 House Report 159–160; 1975 House Hearings 1812–1813 (testimony of Barbara Ringer, Register of Copyrights); *id.*, at 1813 (colloquy between Rep. Pattison and Barbara Ringer).

The Court's attempt to distinguish these cases on the ground of "control," *ante*, at 437, is obviously unpersuasive.   The direct infringer ordi-

Nor is it necessary that the defendant be aware that the infringing activity violates the copyright laws. Section 504(c)(2) of the 1976 Act provides for a reduction in statutory damages when an infringer proves he "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright," but the statute establishes no general exemption for those who believe their infringing activities are legal. Moreover, such an exemption would be meaningless in a case such as this, in which prospective relief is sought; once a court has established that the copying at issue is infringement, the defendants are necessarily aware of that fact for the future. It is undisputed in this case that Sony had reason to know the Betamax would be used by some owners to tape copyrighted works off the air. See 480 F. Supp., at 459–460.

The District Court also concluded that Sony had not caused, induced, or contributed materially to any infringing activities of Betamax owners. *Id.*, at 460. In a case of this kind, however, causation can be shown indirectly; it does not depend on evidence that particular Betamax owners relied on particular advertisements. In an analogous case decided just two Terms ago, this Court approved a lower court's conclusion that liability for contributory trademark infringement could be imposed on a manufacturer who "suggested, even by implication" that a retailer use the manufacturer's goods to infringe the trademark of another. *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 851 (1982); see *id.*, at 860 (opinion concurring in result). I think this standard is equally appropriate in the copyright context.

The District Court found that Sony has advertised the Betamax as suitable for off-the-air recording of "favorite shows," "novels for television," and "classic movies," 480 F. Supp., at 436, with no visible warning that such recording

---

narily is not employed by the person held liable; instead, he is an independent contractor. Neither is he always an agent of the person held liable; *Screen Gems* makes this apparent.

could constitute copyright infringement. It is only with the aid of the Betamax or some other VTR, that it is possible today for home television viewers to infringe copyright by recording off-the-air. Off-the-air recording is not only a foreseeable use for the Betamax, but indeed is its intended use. Under the circumstances, I agree with the Court of Appeals that if off-the-air recording is an infringement of copyright, Sony has induced and materially contributed to the infringing conduct of Betamax owners.[40]

## B

Sony argues that the manufacturer or seller of a product used to infringe is absolved from liability whenever the product can be put to any substantial noninfringing use. Brief for Petitioners 41–42. The District Court so held, borrowing the "staple article of commerce" doctrine governing liability for contributory infringement of patents. See 35 U. S. C. § 271.[41] This Court today is much less positive. See *ante,*

---

[40] My conclusion respecting contributory infringement does not include the retailer defendants. The District Court found that one of the retailer defendants had assisted in the advertising campaign for the Betamax, but made no other findings respecting their knowledge of the Betamax's intended uses. I do not agree with the Court of Appeals, at least on this record, that the retailers "are sufficiently engaged in the enterprise to be held accountable," 659 F. 2d 963, 976 (1981). In contrast, the advertising agency employed to promote the Betamax was far more actively engaged in the advertising campaign, and petitioners have not argued that the agency's liability differs in any way from that of Sony Corporation and Sony Corporation of America.

[41] The "staple article of commerce" doctrine protects those who manufacture products incorporated into or used with patented inventions—for example, the paper and ink used with patented printing machines, *Henry* v. *A. B. Dick Co.*, 224 U. S. 1 (1912), or the dry ice used with patented refrigeration systems, *Carbice Corp.* v. *American Patents Corp.*, 283 U. S. 27 (1931). Because a patent holder has the right to control the use of the patented item as well as its manufacture, see *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 509–510 (1917); 35 U. S. C. § 271(a), such protection for the manufacturer of the incorporated product is necessary to prevent patent holders from extending their monopolies by

at 440–442. I do not agree that this technical judge-made doctrine of patent law, based in part on considerations irrelevant to the field of copyright, see generally *Dawson Chemical Co.* v. *Rohm & Haas Co.*, 448 U. S. 176, 187–199 (1980), should be imported wholesale into copyright law. Despite their common constitutional source, see U. S. Const., Art. I, § 8, cl. 8, patent and copyright protections have not developed in a parallel fashion, and this Court in copyright cases in the past has borrowed patent concepts only sparingly. See *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, 345–346 (1908).

I recognize, however, that many of the concerns underlying the "staple article of commerce" doctrine are present in copyright law as well. As the District Court noted, if liability for contributory infringement were imposed on the manufacturer or seller of every product used to infringe—a typewriter, a camera, a photocopying machine—the "wheels of commerce" would be blocked. 480 F. Supp., at 461; see also *Kalem Co.* v. *Harper Brothers*, 222 U. S., at 62.

I therefore conclude that if a *significant* portion of the product's use is *noninfringing*, the manufacturers and sellers cannot be held contributorily liable for the product's infringing uses. See *ante*, at 440–441. If virtually all of the product's use, however, is to infringe, contributory liability may be imposed; if no one would buy the product for noninfringing purposes alone, it is clear that the manufacturer is purposely profiting from the infringement, and that liability is appropriately imposed. In such a case, the copyright owner's monopoly would not be extended beyond its proper bounds; the manufacturer of such a product contributes to the infringing activities of others and profits directly thereby, while

suppressing competition in unpatented components and supplies suitable for use with the patented item. See *Dawson Chemical Co.* v. *Rohm & Haas Co.*, 448 U. S. 176, 197–198 (1980). The doctrine of contributory patent infringement has been the subject of attention by the courts and by Congress, see *id.*, at 202–212, and has been codified since 1952, 66 Stat. 792, but was never mentioned during the copyright law revision process as having any relevance to contributory *copyright* infringement.

providing no benefit to the public sufficient to justify the infringement.

The Court of Appeals concluded that Sony should be held liable for contributory infringement, reasoning that "[v]ideo-tape recorders are manufactured, advertised, and sold for the primary purpose of reproducing television programming," and "[v]irtually all television programming is copyrighted material." 659 F. 2d, at 975. While I agree with the first of these propositions,[42] the second, for me, is problematic. The key question is not the amount of television programming that is copyrighted, but rather the amount of VTR usage that is infringing.[43] Moreover, the parties and their *amici* have argued vigorously about both the amount of television programming that is covered by copyright and the amount for which permission to copy has been given. The proportion of VTR recording that is infringing is ultimately a question of fact,[44] and the District Court specifically declined to make

---

[42] Although VTR's also may be used to watch prerecorded video cassettes and to make home motion pictures, these uses do not require a tuner such as the Betamax contains. See n. 1, *supra.* The Studios do not object to Sony's sale of VTR's without tuners. Brief for Respondents 5, n. 9. In considering the noninfringing uses of the Betamax, therefore, those uses that would remain possible without the Betamax's built-in tuner should not be taken into account.

[43] Noninfringing uses would include, for example, recording works that are not protected by copyright, recording works that have entered the public domain, recording with permission of the copyright owner, and, of course, any recording that qualifies as fair use. See, *e. g., Bruzzone* v. *Miller Brewing Co.,* 202 USPQ 809 (ND Cal. 1979) (use of home VTR for market research studies).

[44] Sony asserts that much or most television broadcasting is available for home recording because (1) no copyright owner other than the Studios has brought an infringement action, and (2) much televised material is ineligi-ble for copyright protection because videotapes of the broadcasts are not kept. The first of these assertions is irrelevant; Sony's liability does not turn on the fact that only two copyright owners thus far have brought suit. The amount of infringing use must be determined through consideration of the television market as a whole. Sony's second assertion is based on a faulty premise; the Copyright Office permits audiovisual works transmit-

findings on the "percentage of legal versus illegal home-use recording." 480 F. Supp., at 468. In light of my view of the law, resolution of this factual question is essential. I therefore would remand the case for further consideration of this by the District Court.

## VI

The Court has adopted an approach very different from the one I have outlined. It is my view that the Court's approach alters dramatically the doctrines of fair use and contributory infringement as they have been developed by Congress and the courts. Should Congress choose to respond to the Court's decision, the old doctrines can be resurrected. As it stands, however, the decision today erodes much of the coherence that these doctrines have struggled to achieve.

The Court's disposition of the case turns on its conclusion that time-shifting is a fair use. Because both parties agree that time-shifting is the primary use of VTR's, that conclusion, if correct, would settle the issue of Sony's liability under almost any definition of contributory infringement. The Court concludes that time-shifting is fair use for two reasons. Each is seriously flawed.

The Court's first reason for concluding that time-shifting is fair use is its claim that many copyright holders have no objection to time-shifting, and that "respondents have no right to prevent other copyright holders from authorizing it for their programs." *Ante*, at 442. The Court explains that a finding of contributory infringement would "inevitably frustrate the interests of broadcasters in reaching the portion of their audience that is available only through time-shifting."

ted by television to be registered by deposit of sample frames plus a description of the work. See 37 CFR §§ 202.20(c)(2)(ii) and 202.21(g) (1983). Moreover, although an infringement action cannot be brought unless the work is registered, 17 U. S. C. § 411(a) (1982 ed.), registration is not a condition of copyright protection. § 408(a). Copying an unregistered work still may be infringement. Cf. § 506(a) (liability for criminal copyright infringement; not conditioned on prior registration).

*Ante*, at 446. Such reasoning, however, simply confuses the question of liability with the difficulty of fashioning an appropriate remedy. It may be that an injunction prohibiting the sale of VTR's would harm the interests of copyright holders who have no objection to others making copies of their programs. But such concerns should and would be taken into account in fashioning an appropriate remedy once liability has been found. Remedies may well be available that would not interfere with authorized time-shifting at all. The Court of Appeals mentioned the possibility of a royalty payment that would allow VTR sales and time-shifting to continue unabated, and the parties may be able to devise other narrowly tailored remedies. Sony may be able, for example, to build a VTR that enables broadcasters to scramble the signal of individual programs and "jam" the unauthorized recording of them. Even were an appropriate remedy not available at this time, the Court should not misconstrue copyright holders' rights in a manner that prevents enforcement of them when, through development of better techniques, an appropriate remedy becomes available.[45]

---

[45] Even if concern with remedy were appropriate at the liability stage, the Court's use of the District Court's findings is somewhat cavalier. The Court relies heavily on testimony by representatives of professional sports leagues to the effect that they have no objection to VTR recording. The Court never states, however, whether the sports leagues are copyright holders, and if so, whether they have exclusive copyrights to sports broadcasts. It is therefore unclear whether the sports leagues have authority to consent to copying the broadcasts of their events.

Assuming that the various sports leagues do have exclusive copyrights in some of their broadcasts, the amount of authorized time-shifting still would not be overwhelming. Sony's own survey indicated that only 7.3% of all Betamax use is to record sports events of all kinds. Tr. 2353, Defendants' Exh. OT, Table 20. Because Sony's witnesses did not represent all forms of sports events, moreover, this figure provides only a tenuous basis for this Court to engage in factfinding of its own.

The only witness at trial who was clearly an exclusive copyright owner and who expressed no objection to unauthorized time-shifting was the owner of the copyright in Mister Rogers' Neighborhood. But the Court

The Court's second stated reason for finding that Sony is not liable for contributory infringement is its conclusion that even unauthorized time-shifting is fair use. *Ante,* at 447 *et seq.* This conclusion is even more troubling. The Court begins by suggesting that the fair use doctrine operates as a general "equitable rule of reason." That interpretation mischaracterizes the doctrine, and simply ignores the language of the statute. Section 107 establishes the fair use doctrine "for purposes such as criticism, comment, news reporting, teaching, . . . scholarship, or research." These are all productive uses. It is true that the legislative history states repeatedly that the doctrine must be applied flexibly on a case-by-case basis, but those references were only in the context of productive uses. Such a limitation on fair use comports with its purpose, which is to facilitate the creation of new works. There is no indication that the fair use doctrine has any application for purely personal consumption on the scale involved in this case,[46] and the Court's application of it here deprives fair use of the major cohesive force that has guided evolution of the doctrine in the past.

---

cites no evidence in the record to the effect that anyone makes VTR copies of that program. The simple fact is that the District Court made no findings on the amount of authorized time-shifting that takes place. The Court seems to recognize this gap in its reasoning, and phrases its argument as a hypothetical. The Court states: "*If* there are millions of owners of VTR's who make copies of televised sports events, religious broadcasts, and educational programs such as Mister Rogers' Neighborhood, and *if* the proprietors of those programs welcome the practice," the sale of VTR's "should not be stifled" in order to protect respondents' copyrights. *Ante,* at 446 (emphasis supplied). Given that the Court seems to recognize that its argument depends on findings that have not been made, it seems that a remand is inescapable.

[46] As has been explained, some uses of time-shifting, such as copying an old newspaper clipping for a friend, are fair use because of their *de minimis* effect on the copyright holder. The scale of copying involved in this case, of course, is of an entirely different magnitude, precluding application of such an exception.

Having bypassed the initial hurdle for establishing that a use is fair, the Court then purports to apply to time-shifting the four factors explicitly stated in the statute. The first is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1). The Court confidently describes time-shifting as a noncommercial, nonprofit activity. It is clear, however, that personal use of programs that have been copied without permission is not what § 107(1) protects. The intent of the section is to encourage users to engage in activities the primary benefit of which accrues to others. Time-shifting involves no such humanitarian impulse. It is likewise something of a mischaracterization of time-shifting to describe it as noncommercial in the sense that that term is used in the statute. As one commentator has observed, time-shifting is noncommercial in the same sense that stealing jewelry and wearing it—instead of reselling it—is noncommercial.[47] Purely consumptive uses are certainly not what the fair use doctrine was designed to protect, and the awkwardness of applying the statutory language to time-shifting only makes clearer that fair use was designed to protect only uses that are productive.

The next two statutory factors are all but ignored by the Court—though certainly not because they have no applicability. The second factor—"the nature of the copyrighted work"—strongly supports the view that time-shifting is an infringing use. The rationale guiding application of this factor is that certain types of works, typically those involving "more of diligence than of originality or inventiveness," *New York Times Co.* v. *Roxbury Data Interface, Inc.*, 434 F. Supp. 217, 221 (NJ 1977), require less copyright protection than other original works. Thus, for example, informational

---

[47] Home Recording of Copyrighted Works: Hearing before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 2d Sess., pt. 2, p. 1250 (1982) (memorandum of Prof. Laurence H. Tribe).

works, such as news reports, that readily lend themselves to productive use by others, are less protected than creative works of entertainment. Sony's own surveys indicate that entertainment shows account for more than 80% of the programs recorded by Betamax owners.[48]

The third statutory factor—"the amount and substantiality of the portion used"—is even more devastating to the Court's interpretation. It is undisputed that virtually all VTR owners record entire works, see 480 F. Supp., at 454, thereby creating an exact substitute for the copyrighted original. Fair use is intended to allow individuals engaged in productive uses to copy small portions of original works that will facilitate their own productive endeavors. Time-shifting bears no resemblance to such activity, and the complete duplication that it involves might alone be sufficient to preclude a finding of fair use. It is little wonder that the Court has chosen to ignore this statutory factor.[49]

The fourth factor requires an evaluation of "the effect of the use upon the potential market for or value of the copyrighted work." This is the factor upon which the Court focuses, but once again, the Court has misread the statute. As mentioned above, the statute requires a court to consider the effect of the use on the *potential* market for the copyrighted work. The Court has struggled mightily to show that VTR use has not *reduced* the value of the Studios' copyrighted works in their *present* markets. Even if true, that showing only begins the proper inquiry. The development

---

[48] See A Survey of Betamax Owners, Tr. 2353, Defendants' Exh. OT, Table 20, cited in Brief for Respondents 52.

[49] The Court's one oblique acknowledgment of this third factor, *ante*, at 447, and n. 30, seems to suggest that the fact that time-shifting involves copying complete works is not very significant because the viewers already have been asked to watch the initial broadcast free. This suggestion misses the point. As has been noted, a book borrowed from a public library may not be copied any more freely than one that has been purchased. An invitation to view a showing is completely different from an invitation to copy a copyrighted work.

of the VTR has created a new market for the works produced by the Studios. That market consists of those persons who desire to view television programs at times other than when they are broadcast, and who therefore purchase VTR recorders to enable them to time-shift.[50] Because time-shifting of the Studios' copyrighted works involves the copying of them, however, the Studios are entitled to share in the benefits of that new market. Those benefits currently go to Sony through Betamax sales. Respondents therefore can show harm from VTR use simply by showing that the value of their copyrights would *increase* if they were compensated for the copies that are used in the new market. The existence of this effect is self-evident.

Because of the Court's conclusion concerning the legality of time-shifting, it never addresses the amount of noninfringing use that a manufacturer must show to absolve itself from liability as a contributory infringer. Thus, it is difficult to discuss how the Court's test for contributory infringement would operate in practice under a proper analysis of time-shifting. One aspect of the test as it is formulated by the Court, however, particularly deserves comment. The Court explains that a manufacturer of a product is not liable for contributory infringement as long as the product is *"capable* of substantial noninfringing uses." *Ante,* at 442 (emphasis supplied). Such a definition essentially eviscerates the concept of contributory infringement. Only the most unimaginative manufacturer would be unable to demonstrate that a image-duplicating product is "capable" of substantial noninfringing uses. Surely Congress desired to prevent the sale of products that are used almost exclusively to infringe copyrights;

---

[50] The Court implicitly has recognized that this market is very significant. The central concern underlying the Court's entire opinion is that there is a large audience who would like very much to be able to view programs at times other than when they are broadcast. *Ante,* at 446. The Court simply misses the implication of its own concerns.

the fact that noninfringing uses exist presumably would have little bearing on that desire.

More importantly, the rationale for the Court's narrow standard of contributory infringement reveals that, once again, the Court has confused the issue of liability with that of remedy. The Court finds that a narrow definition of contributory infringement is necessary in order to protect "the rights of others freely to engage in substantially unrelated areas of commerce." *Ante,* at 442. But application of the contributory infringement doctrine implicates such rights only if the remedy attendant upon a finding of liability were an injunction against the manufacture of the product in question. The issue of an appropriate remedy is not before the Court at this time, but it seems likely that a broad injunction is not the remedy that would be ordered. It is unfortunate that the Court has allowed its concern over a remedy to infect its analysis of liability.

## VII

The Court of Appeals, having found Sony liable, remanded for the District Court to consider the propriety of injunctive or other relief. Because of my conclusion as to the issue of liability, I, too, would not decide here what remedy would be appropriate if liability were found. I concur, however, in the Court of Appeals' suggestion that an award of damages, or continuing royalties, or even some form of limited injunction, may well be an appropriate means of balancing the equities in this case.[51] Although I express no view on the merits

---

[51] Other nations have imposed royalties on the manufacturers of products used to infringe copyright. See, *e. g.,* Copyright Laws and Treaties of the World (UNESCO/BNA 1982) (English translation), reprinting Federal Act on Copyright in Works of Literature and Art and on Related Rights (Austria), §§ 42(5)–(7), and An Act dealing with Copyright and Related Rights (Federal Republic of Germany), Art. 53(5). A study produced for the Commission of European Communities has recommended that these requirements "serve as a pattern" for the European community. A. Dietz, Copyright Law in the European Community 135 (1978). While these roy-

of any particular proposal, I am certain that, if Sony were found liable in this case, the District Court would be able to fashion appropriate relief. The District Court might conclude, of course, that a continuing royalty or other equitable relief is not feasible. The Studios then would be relegated to statutory damages for proven instances of infringement. But the difficulty of fashioning relief, and the possibility that complete relief may be unavailable, should not affect our interpretation of the statute.

Like so many other problems created by the interaction of copyright law with a new technology, "[t]here can be no really satisfactory solution to the problem presented here, until Congress acts." *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S., at 167 (dissenting opinion). But in the absence of a congressional solution, courts cannot avoid difficult problems by refusing to apply the law. We must "take the Copyright Act . . . as we find it," *Fortnightly Corp.* v. *United Artists Television, Inc.*, 392 U. S., at 401–402, and "do as little damage as possible to traditional copyright principles . . . until the Congress legislates." *Id.*, at 404 (dissenting opinion).

---

alty systems ordinarily depend on the existence of authors' collecting societies, see *id.*, at 119, 136, such collecting societies are a familiar part of our copyright law. See generally *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 4–5 (1979). Fashioning relief of this sort, of course, might require bringing other copyright owners into court through certification of a class or otherwise.